## PACIFIC GAS & ELECTRIC CO.

v.

## The UNITED STATES.

No. 182–80C.

United States Claims Court.

Aug. 30, 1983.

David J. Williamson, San Francisco, Cal., for plaintiff; Robert Ohlbach, San Francisco, Cal., of counsel.

Cheryl S. Rome, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant; Richard Flynn, San Francisco, Cal., U.S. Dept. of Agriculture, Office of Gen. Counsel, of counsel.

## MEMORANDUM OF DECISION

HARKINS, Judge.

Plaintiff (Pacific Gas and Electric Company, or PG & E) filed a petition in the United States Court of Claims on April 18, 1980,[1] to recover damages of $1,575,148.38 for reconstruction of a road in the Sierra National Forest, Fresno County, California. The petition stated three causes of action: (1) arbitrary and capricious abuse of discretion for failure to share costs in accordance with applicable regulations; (2) breach of an implied-in-fact contract to pay for a portion of costs of reconstruction; (3) an unconstitutional taking of property without just compensation, and a claim for recovery of prejudgment interest since 1976.[2]

---

1. Plaintiff's claim was transferred to the United States Claims Court on Oct. 1, 1982, pursuant to section 403(d) of the Federal Courts Improvement Act of 1982 (Pub.L. No. 97–164, 96 Stat. 25, 58).

2. Plaintiff concedes the cause of action for a taking under the fifth amendment has no basis in precedent. The taking claim, and the related claim for prejudgment interest, have been withdrawn.

After the parties had completed extended discovery through depositions and production of documents, and plaintiff had submitted its response to the Court of Claims standard pretrial order on liability, defendant, on June 23, 1982, moved for summary judgment on all liability issues. At oral argument on May 25, 1983, a ruling was made that defendant is entitled to prevail on its motion for summary judgment. There is no genuine issue as to any fact material to liability issues in plaintiff's remaining causes of action—breach of an implied-in-fact contract, or, arbitrary and capricious abuse of discretion.

The road in issue is Forest Service road No. 11S40, known as the McKinley Grove Road (MGR). It is designated by the Forest Service, Department of Agriculture, as "a special service road." MGR is approximately 16 miles long; the portion involved in this case is entirely in the Sierra National Forest and in the Forest Service area of responsibility. It was constructed in the 1930's by the Forest Service and in 1957–58 plaintiff added about 3.9 miles of the MGR in conjunction with its construction of the Wishon and Courtright dams. By 1971, although it had evolved into a major haul road for timber operations, and a primary access road for recreational traffic to the Wishon and Courtright reservoirs and a number of Forest Service picnic and camp grounds, it was still a narrow two-lane road without a stabilized surface. In 1971, the Forest Service had started to upgrade approximately 7.7 miles of the MGR at an estimated cost of $1,057,000.

A report dated July 3, 1972, by the engineering staff of Region 5 of the Forest Service, entitled "Feasibility Report—Reconstruction of McKinley Grove Road, 11S40," recommended that the MGR be improved, by means of public works contracts or timber sale contracts, to provide a full two lane width over approximately 16.7 miles with a stabilized roadway surface. The work described in this feasibility report was not funded in 1972. Forest Service planning for future projects, however, included reconstruction and upgrading of the MGR over a 5- or 10-year period, to a two lane width, for summertime use only, as funds became available.

Plaintiff's interest in reconstruction of the MGR stems from its potential for use as access to the Helms Pump Storage Project of the Federal Power Commission (FPC, now Federal Energy Regulatory Commission, FERC). On September 19, 1973, plaintiff applied for a 50 year license to authorize the construction, operation and maintenance of a proposed pumped storage electric power development that would utilize the existing artificial Courtright and Wishon reservoirs. The MGR was plaintiff's preferred route for all weather access to the Helms project area.

Plaintiff owned approximately 726 acres of land near the eastern end of the MGR, outside of the Sierra National Forest. No part of the MGR that was upgraded was on property owned by plaintiff, or on land obtained for the Helms project.

The FPC issued the license for the Helms project to plaintiff on May 18, 1976. On June 17, 1976, the Forest Supervisor issued to plaintiff, free of charge, a Class E special use permit for the "reconstruction, maintenance and use" of the MGR. On June 19, 1976, plaintiff contracted to have the MGR reconstructed in accordance with specifications approved by the Forest Service. Reconstruction was completed on December 23, 1976, and notice of completion was given on June 16, 1977. The cost to plaintiff to complete the reconstruction, to a 20-year, all-weather standard, was $2,727,462.92.

Plaintiff initiated discussions at the district level of the Forest Service in July 1973 for use of the MGR as access to the Helms project. These discussions were concerned with plaintiff's need for an improved all-season road that would support a large volume of heavy construction traffic during an estimated 5-year construction period. The discussions also included inquiries about cost contributions from the Forest Service for upgrading the MGR. In the discussions and negotiations, the Forest Supervisor of the Sierra National Forest, and his subordinates, were interested in having the MGR

upgraded, and to this end cooperated with plaintiff in attempts to determine the appropriate means of sharing the cost of reconstruction.

Plaintiff's discussions and negotiations for reconstruction and use of the MGR primarily were conducted with Forest Service employees at the national forest supervisory level, or below.[3] No one under the level of the Regional Forester had authority to obligate the Forest Service to a contract with plaintiff concerning the costs of the MGR reconstruction. From the beginning of the negotiations on July 31, 1973, the representatives of both parties discussed and were aware that the negotiators at the Forest level could not enter a final agreement and could only recommend actions to the Regional Forester.

During 1973 and 1974, the parties held many negotiating sessions in which both sides considered a cost share agreement to be an appropriate vehicle for reconstruction of the MGR. The Forest Supervisor and his associates initially pursued this approach and recommended its adoption to the Regional Forester. Plaintiff was not told officially until March 25, 1975, that a cost share agreement could not be applied in the MGR reconstruction.

In accord with this belief that a cost share agreement was appropriate, on January 24, 1974, the District Ranger forwarded to plaintiff extracts from the Forest Service Manual (FSM) that outlined the laws, regulations and guidelines on the operation of the Forest development road system. The material consisted of extracts from FSM § 7700, with the sections that covered

the cost share agreement procedure specifically emphasized.[4]

On February 4, 1974, the Forest Supervisor provided an explanation of Forest system rules applicable to the MGR. This letter advised that, as the MGR was a special service road, the Forest Service would require that, (1) prior to any commercial hauling for the Helms project, the road be reconstructed to a standard approved by the Forest Service which would adequately provide for the traffic loads and intensity for a year-long operation, (2) that plaintiff participate in a road maintenance agreement, and (3) that plaintiff participate in a cost share agreement which will prorate the cost incurred in the initial construction and reconstruction of the road commensurate with their estimated project-generated use.

The February 4, 1974, letter also attached preliminary calculations for the cost share agreement. With respect to cost sharing, the letter stated that plaintiff "will have to assume the Forest Service share of the reconstruction costs in order to meet the company's proposed schedule for the Helms Project," which could "be redeemed by collection rights against future National Forest timber sale receipts."

Between February and November 1974, the parties worked jointly on cost share calculations for the MGR. Differences arose as to the appropriate "unit factor" to be used in share calculations and responsibility for recreation traffic generated by the Helms project. Tentative agreements were reached. The negotiators agreed to use a unit factor of 13.8, and calculations

**3.** The Forest Service organization is: (1) a central office in Washington, D.C., headed by the Chief of the Forest Service, under the Secretary of Agriculture; (2) nine geographic regions, each with a headquarters office supervised by a Regional Forester, that include national forests or other lands administered by the Forest Service; (3) national forests, each with a headquarters office supervised by a Forest Supervisor who is responsible to the Regional Forester; and (4) ranger districts, which include a portion of a national forest, national grassland, or wilderness or primitive area, supervised by a District Ranger who is responsible to the Forest

Supervisor. 36 C.F.R. §§ 200.1 and 200.2. The Sierra National Forest is in Region 5.

**4.** The material marked for emphasis included FSM § 7770.5, which defines cost sharing, and FSM § 7772, which describes "special service" roads. Forms of cost sharing are: (1) Cooperation, through road right-of-way construction and use agreements or through supplemental work; (2) Required Work; or (3) Cost Recovery. Roads may be designated as special service, for purposes of traffic regulation and in order that cost sharing of Government investment in construction, reconstruction, and maintenance may be required of benefiting users.

were made on the Forest Service contention that plaintiff was responsible for project generated recreation traffic. These negotiations resulted in an apportionment of $1.9 million to plaintiff as its share of a total estimated cost of reconstruction of $3.1 million, with a Forest Service share of $1.2 million.

On November 22, 1974, the District Ranger sent to the Forest Supervisor an application for a road use permit for the MGR. The transmittal memorandum recited that final reconstruction plans were being prepared, and that a rough draft of the cooperative agreement had been prepared. The memorandum stated: "We have prepared cost share calculations which the applicant has reviewed and indicated agreement. Engineering is in the process of formulating the maintenance agreement portion of the total permit package."

The report that accompanied the application included statements that (1) the plaintiff and the Forest Service would enter into a cooperative agreement covering the reconstruction of the MGR prior to issuance of the use permit, (2) costs of reconstruction would be prorated by commensurate shares of estimated traffic volumes over a 20-year economic life, and (3) that applicant may be required to provide the total reconstruction financing with interest free collection rights on stipulated future timber sales.

Review by Region 5 personnel of the use permit application and the cost sharing agreement recommended by the Forest level staff, produced a change in the Forest Service's negotiating position. This change was communicated to plaintiff at a conference on March 25, 1975. This meeting, which included representatives from the Regional office and from the Department's Office of General Counsel, as well as Forest level personnel, centered around the Forest Service authority, method and shares of the proposed cost share agreement with plaintiff. At the meeting, plaintiff was told that the MGR upgrading did not qualify under FSM Title 7700 for a road right-of-way construction and use agreement, or for the cost sharing allocations for estimated traffic volumes authorized in FSM § 7772.-24 (now FSM § 7731.3).

The Forest Service representatives explained that, contrary to the initial position taken by Forest level personnel, the provisions in the Forest Service Manual relative to a cooperative road construction and use agreement, and the related cost sharing calculations, did not apply to the MGR reconstruction necessitated by the Helms project. Forest Service procedures and regulations for such cost sharing road right-of-way construction and use agreements were designed for situations where each party had land holdings that required a jointly owned road system for development of their respective resources. Work on the MGR would not result in a jointly owned road. Further, plaintiff required a double lane, hard surfaced, all weather road for construction of the Helms project. Plaintiff's requirements, without regard to the Forest Service needs, would satisfy the demands for all other traffic. For this reason, the Regional Forester's staff questioned why the Forest Service should make any commitment to share in the reconstruction of the MGR.

The March 25, 1975, meeting concluded with a recognition by the Forest Service personnel that there would be benefits to the public from upgrading the road. The amount of such benefits, and their priority, however, would have to be reevaluated before the negotiations could continue.

On April 4, 1975, the Forest Supervisor by letter confirmed the position taken at the March 25, 1975, meeting that the initial negotiations, and the respective $1.2—$1.9 million shares, were based on an erroneous conception of Forest Service authority and regulations. The Forest Supervisor, however, offered to request the Regional Forester to approve a Forest Service share of $1.2 million. The letter stated:

The basis for my position that cooperation by the Government is fair and appropriate is that direct benefits to the Government will accrue by PG & E's reconstruction of the road. On this basis, and because we arrived at $1.2 million as

the Government's "share" in good faith, I am prepared to request approval by the Regional Forester up to this amount. I believe that the Company needs to examine the hard reality that the principal need for the reconstruction investments in the McKinley Grove Road is the Helms Creek Project. This need can be viewed as being exclusive of recreation traffic, whether project generated or not. This, of course, is the premise of the position taken by the Regional Forester's staff. There are, of course, serious ramifications to this Regional Office disagreement with my stated commitment to share in the reconstruction costs. Additional references were given to PG & E representatives at the close of our meeting and we agreed to an additional meeting in San Francisco on April 15 to discuss this further.

At the April 15, 1975, meeting, the Forest Service representative from the Regional office reasserted the position that the MGR was not eligible for a cost share agreement and refused to compromise on the contention that Helms project-induced recreation traffic was plaintiff's responsibility. Plaintiff's response to the Forest Supervisor's April 4, 1975, letter, which was distributed at the conference, did not accept the offer to go forward on the basis that benefits to the Forest Service amounted to $1.2 million. Plaintiff's April 15, 1975, response attached an "exploratory" legal memorandum which concluded that cost sharing was appropriate for MGR upgrading and that public recreational traffic in or out of the Helms project was the sole responsibility of the Forest Service.

On August 12, 1975, the Regional Forester responded to plaintiff's April 15, 1975, letter and legal memorandum. With respect to sharing of costs for reconstruction of the MGR, the Regional Forester determined:

1. Cost sharing either through a Cooperative Road right-of-way Construction and Use Agreement (FSM 5467), or by recovering a share of the Government's investment in a road (FSM 7772.2), is not applicable in the case of the McKinley Grove Road.

2. Cooperative agreements (FSM 5467), are entered into with major landowners whose lands are intermingled with National Forest land and who have continuing long-term need for a road system to manage these lands and utilize their resources. The Agreement calls for joint financing of the system and results in joint ownership of the cost shared roads with the Government.

. . . .

2. In the case of the McKinley Grove Road, PG & E is requiring very heavy use of a Forest Development Road for a relatively short period of time. In order to accommodate PG & E's use and at the same time provide for current uses of the road, major reconstruction of the road is required. This situation is described in FSM 7772.4 and more specifically in FSM 7772.42. Under these circumstances, the non-Federal user (PG & E) is required to do the reconstruction. A road use permit would be issued to PG & E authorizing use of the road and would specify the necessary reconstruction needed. This reconstruction would be at the expense of PG & E except under special circumstances.

In the case of the McKinley Grove Road, the Forest Service *may* be justified in contributing toward the reconstruction since it is a Forest Service long-term objective to upgrade the road to serve public land use needs. This situation would be covered under a Class E Special Use Road Permit for construction of a Planned Forest Development Road (FSM 2733.15). However, the existing road already constitutes a substantial contribution by the public toward development of the needed facility.

Although he concluded the Forest Service was not obligated to make a cost share agreement with plaintiff, the Regional Forester was willing to continue discussions and consider equitable shares for the MGR reconstruction. He noted that the Forest Service in the past had participated with

other public agencies and private companies in situations similar to the MGR and that equitable agreements on sharing costs of construction and maintenance were made. Final decision on the type and/or amount of Forest Service contributions, however, would be "based on benefits to the public in relation to management of National Forest lands."

On October 14, 1975, plaintiff made a detailed, point by point response to the Regional Forester and looked toward further negotiations. As a private landowner, plaintiff asserted it was eligible for a cooperative road right-of-way construction and use agreement under Forest Service regulations, and its status as a public utility landowner entitled it to favorable consideration. The letter included the following statements:

> In short, as a major landowner and as an F.P.C. licensee PG and E believe that it falls quite clearly within the cooperation and cost sharing provisions of Title 5400. PG and E made no particular attempt to define its status in the early stages of the negotiations since at that point the Forest Service was quite willing to employ the standards for cost sharing set out in FSM 5467.03b. Hopefully, any confusion as to our status has now been disspelled.
>
> . . . .
>
> The simple facts are that (a) any private landowner requiring improved access for development traffic would be entitled to cooperation and cost sharing under Title 5400 and (b) any mere hauler of goods for use on private land would only be required to contribute "the proportionate share of Government investment serving [his] uses." Where an applicant is *both* a major landowner and a major investor in Forest development in the public interest, it seems inconceivable that such an applicant would be accorded less favorable treatment than conventional landowners or mere "commercial haulers."
>
> . . . .

Based on past experience, I share your confidence in our ability to resolve this matter on an acceptable basis. I have asked the relevant members of the Helms Project group to meet with you and other concerned Forest Service officials as soon as possible with the aim of reaching such a resolution. As you know, if this matter is not cleared upon in the near future, it could have serious consequences for this much needed project.

On December 30, 1975, the Regional Forester notified plaintiff that its October 14, 1975, letter had been reviewed in the Forest Service and by the Department's Office of General Counsel. This combined review convinced the Forest Service that it was not required to share costs with plaintiff in the reconstruction of the MGR, and the position stated in the August 12, 1975, letter remained unchanged. The Regional Forester reiterated a willingness to continue discussions "on the basis of mutual benefits derived from the road reconstruction and to consider equitable shares in relation to those benefits derived."

On January 6, 1976, plaintiff formally requested the Forest Supervisor to issue a Class A permit (FSM § 2733.11), allowing work to go forward, pending completion of a cooperative agreement and/or issuance of appropriate easements. This letter was to be considered plaintiff's "formal application for the appropriate road easements." The Forest Supervisor rejected this request on January 26, 1976, as not in accord with the current Forest Service position which was contained in the Regional Forester's August 12 and December 30, 1975, letters. On February 9, 1976, plaintiff wrote to the Regional Forester that plaintiff and the Forest Service "should now sit down and define exactly what the situation is relative to permit issuance, easement issuance, and dollar figures of participation."

Further negotiations did not remove the impasse. The Class E special use permit, issued on June 17, 1976, reserved the position of each party. The "non-waiver" clause stated:

12. Granting of this permit by the Forest Service and acceptance by Pacific Gas and Electric Company, will not, in any way, constitute either a waiver of or an enhancement of Pacific Gas and Electric Company's claim that reconstruction of the McKinley Grove Road should be governed by a cooperative road agreement.

In June 1976, plaintiff contracted with Sequoia Forest Industries to be paid for the reconstruction of 2.6 miles of the MGR as specified in the Smith Timber Sale Agreement with the Sierra National Forest. Plaintiff ultimately received $143,358 from the purchaser credit allowance made to Sequoia in the Smith Timber Sale.

A Memorandum of Agreement for the Helms project, executed by plaintiff on August 12, 1976, and by the Regional Forester on October 14, 1976, recited respective obligations of the parties relative to plaintiff's FPC license and its impact on Sierra National Forest conditions. Paragraph 8 provided that plaintiff "shall enter into a cooperative agreement for the reconstruction and maintenance of the McKinley Grove Road for the period of project construction to the standard stipulated by the Forest Service."

On January 28, 1977, a senior counsel in plaintiff's legal department wrote the representative of the Department's Office of General Counsel that the bulk of the reconstruction work was completed and that plaintiff should shortly be in a position to define the precise costs involved. The letter confirmed conversations "that we should be in a position to return to our negotiations concerning the form of cost/share arrangement to be applied to the McKinley Grove Road improvements" and suggested a meeting of counsel "to define the remaining issues" and establish an agenda and schedule for further group meetings.

Further negotiating sessions between the representatives of the parties did not produce an agreement on how the costs of the MGR improvements were to be shared. On August 18, 1977, in a letter to the Forest Supervisor, plaintiff's senior counsel recited the history of negotiations in detail, with the following summary:

I would remind you that by this time PG and E, albeit with growing impatience and concern, had obediently tramped with the Forest Service through three complete changes in the supposed "correct" approach to this problem. (1) First we accepted the proposition that costs were to be shared and recreation traffic was a Forest Service responsibility. At considerable expense in time, money and effort we worked through the whole equivalent analysis in order to reach numbers that correctly allocated traffic units. (2) Next, when you didn't like the numbers associated with that system we heard that costs were indeed to be shared, but recreation traffic was to be allocated to PG and E. After a great deal of research in relatively unfamiliar material we pointed out that if costs were to be shared it was perfectly clear that all available expressions of policy and regulation required the recreation traffic to go to the agency responsible for encouraging, supervising and limiting that traffic—the Forest Service. (3) Now it was announced that the whole cost sharing agreement concept was to be abandoned and that the Forest Service would proceed only on a permit and contribution would be based only on the benefits actually flowing to it from the work. We made one last effort to point out the appropriateness of the cost sharing regulations, but that was summarily rejected. Thus, we arrived at our present situation where the work has actually been done and PG and E has incurred all the costs. Again, we have undertaken to follow your instructions and this time determine the benefit accruing to the Forest Service.

The letter concluded with cost figures that represented "a close approximation of final costs and represent numbers which can be used in settlement." These cost figures allocated to plaintiff benefits for winteriz-

ing costs of $561,395 and $143,358 from the Smith Timber Sale, with cost to the Forest Service of $1,441,316.

On October 5, 1977, the Forest Supervisor responded that the Forest Service would be willing to contribute an equitable portion of the reconstruction costs. The equitable contribution would be based on the estimated capital investment in the road planned by the Forest Service, but canceled as a result of plaintiff's work. In addition to the $143,358 from the Smith Timber Sale, the Forest Supervisor would transmit $668,890 as funds became available, which would make a total payment to plaintiff of $812,248.

On November 29, 1978, plaintiff's senior counsel, in a letter to the Forest Supervisor, rejected the $812,248 offer as unacceptable because it did not bear a direct relationship to the Forest Service's planned capital investment that was canceled as a result of plaintiff's work. Plaintiff calculated that the cost of the MGR built to USFS standards for only non-winter use would be $2,100,197.84; allocation of 25 percent to plaintiff for the first 5 years use, produced a figure of $1,575,148.38. Plaintiff offered to compromise at $1.5 million. The letter stated plaintiff was willing to consider further limited compromise, but that any compromise offer from the Forest Service must be based upon cost savings to the Forest Service in not having to perform its planned road reconstruction.

On February 14, 1979, the Forest Supervisor reiterated the October 5, 1977, offer as an equitable contribution, and enclosed an agreement for plaintiff to sign that stated:

Forest Service has paid $143,358 to PG & E and agrees to pay an additional $668,890 to PG & E, as funds become available, for a total of $812,248 planned project costs as the Forest Service equitable contribution toward reconstruction of the road.

The February 14, 1979, letter notified plaintiff of appeal rights under 36 C.F.R. § 211. Plaintiff appealed to the Regional Forester on March 30, 1979; the Forest Supervisor responded on April 30, 1979, and

plaintiff replied on May 11, 1979. On June 5, 1979, the Regional Forester sustained the October 5, 1977, proposal to pay plaintiff a total of $812,248 ($476,158 plus $336,090 for asphalt concrete requested by the Forest Service). The Regional Forester's conclusions in part were:

3. All work performed by PG & E on the McKinley Grove Road, except for the asphalt concrete requested by the Forest Service, was required for the Helms hydroelectric project construction.

. . . .

5. The basis for determining the Forest Service equitable contribution, i.e., the estimated capital investment planned by the Forest Service but cancelled as a result of advance reconstruction, is reasonable and within the range permissible by policy as shown in Forest Service Manual 2733.15.

Plaintiff made a timely appeal to the Chief of the Forest Service and made an oral presentation on November 13, 1979. The January 15, 1980, final decision of the Department of Agriculture reduced the Forest Service total obligation to plaintiff to $336,090, in payment for the asphalt concrete surface provided at Forest Service request. This reduction was made on the ground that the Forest Service has no authority to use receipts from future timber sales to pay for past investment by a non-Federal permittee. The decision included the following statements:

2. Sharing of costs is appropriate. The proper method to be used in this case is the Required Work Method (FSM 7772.42, now FSM 7731.3).

. . . .

The term "cost sharing" is defined in FSM 7731.05 to include all forms of sharing construction or reconstruction costs. These are further categorized as Cooperation, Required Work, and Cost Recovery.

. . . .

Cost sharing through a Cooperative Road Right-of-Way Construction and Use

Agreement is not appropriate in this case. This situation does not meet the prerequisites for a joint road system. It would be disadvantageous to the United States to enter into a joint ownership of a Forest Development Road where the Forest Service is not in need of reciprocal rights-of-way.

....

The Required Work category includes work necessary to safely accommodate the applied for use when a road will not adequately carry the permittee's traffic. This is the minimum work required to accommodate the permittee's use. Work may be required of the permittee, or deposits may be required to permit the Forest Service to perform the work. All value of work or deposits will be credited to the share of costs to be borne by the permittee. The value of required work may exceed the share to be recovered from the permittee for use of the existing road. The additional cost is borne by the permittee, but the permittee is given credit for the amount expended. The excess credit may be used to offset his share in any subsequent investment by the government.

The reconstruction was required to accommodate PG & E's immediate need. Therefore, the Required Work method is the appropriate method in this case. The excess costs incurred by PG & E will be credited to their account and will be used to cover any future obligation it may incur.

....

The additional asphalt concrete surfacing requested by the Forest Service was in excess of that required for PG & E's intended use of the road. The Forest Service recognizes an obligation to reimburse the company for this cost even though a formal purchase agreement was never executed. The obligation would have been ratified by a Contracting Officer authorized to do so. The payment of $336,090 will then be processed as a procurement action.

## DISPOSITION

In support of its claim that the conduct of the parties erected an implied-in-fact contract for the Forest Service to share in the cost of upgrading the MGR, plaintiff points to the initial negotiating position of both parties that was premised on the concept that a cooperative cost sharing agreement was appropriate. Plaintiff emphasizes the agreement made by the negotiators on March 7, 1974, to use a unit factor of 13.8 in share calculations, and the November 22, 1974, memorandum that transmitted the completed application for plaintiff's road use permit, in which the District Ranger told the Forest Supervisor that plaintiff "has reviewed and indicated agreement" with cost share calculations that assigned to plaintiff recreational traffic generated by the Helms project. Plaintiff also contends an implied-in-fact contract was created by the actual reconstruction in 1976–77 of the MGR, after the Forest Service had changed its position and stated it would negotiate an equitable contribution on the basis that direct benefits would accrue to the Government from plaintiff's reconstruction of the MGR. Plaintiff regards its conduct in the act of reconstruction as an acceptance of the Forest Service's offer to pay for "benefits to the public." These benefits the Forest Supervisor valued at $1.2 million on April 4, 1975, and the Regional Forester valued at $812,248 on February 14, 1979, and which plaintiff asserts should be valued at the very least by the extent its work was a substitute for the Forest Service's work.

 This court has jurisdiction over contracts which are implied-in-fact.[5] A contract implied-in-fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is

___

**5.** 28 U.S.C. § 1491, *as amended,* Pub.L. No. 97–164, Apr. 2, 1982, 96 Stat. 39; *Russell Corp. v. United States,* 537 F.2d 474 (Ct.Cl.1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); General Order No. 1, Oct. 7, 1982; *Wertz v. United States,* 2 Cl.Ct. 45 (1983).

not essential to consummation of the agreement.[6] It is essential, however, that the acceptance of an offer be manifested by conduct that indicates assent to the proposed bargain.[7] The requirements of mutuality of intent, and the lack of ambiguity in offer and acceptance, are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs.[8] The officer whose conduct is relied upon must have had actual authority to bind the Government in contract.[9] It is plaintiff's burden to prove that an implied-in-fact contract was made. Extensive negotiations in which the parties demonstrate hope and intent to reach an agreement are not sufficient in themselves to establish a contract implied-in-fact.[10] Moreover, in negotiations where the parties contemplate that their contractual relationship would arise by means of a written agreement, no contract can be implied.[11]

The undisputed facts in this case, established in massive documentation of negotiations from 1973 to 1979, do not meet the standards for an implied-in-fact contract, and none was established.

Plaintiff is an experienced organization and is accustomed to dealing with governmental agencies on contract matters. Early in the negotiations the Forest Service Manual was made available to plaintiff's negotiators, and applicable statutory law and agency regulations were analyzed by plaintiff's legal department. Plaintiff knew that final contracting authority relative to a cost share agreement was not lodged in Forest level personnel and that any agreements reached by the negotiators in the period before the March 25, 1975, meeting could not become final until approved at the Regional Forester level. No contract could come into existence merely because the Forest level negotiators initially believed a cost share agreement was appropriate, negotiated in such belief, and agreed with plaintiff's negotiators on many details involved in calculating the respective shares, such as a unit factor of 13.8, and allocation of responsibility for recreational traffic generated by the Helms project. Both parties recognized such agreements were preliminary and tentative until reviewed and approved, and not binding upon the Government because they were made by personnel without authority to make final agreements.

Region 5 review disclosed error in the initial negotiations, and plaintiff was told in the March 25, 1975, conference that the MGR upgrading did not qualify for a cost share agreement. Clearly, no implied-in-fact contract for a cost share agreement existed on March 25, 1975—none of the elements essential for an implied-in-fact contract existed.

At the March 25, 1975, meeting, the Forest Service recognized that there would be benefits to the public from upgrading of the MGR and offered to negotiate on that basis. Plaintiff, however, continued to assert a cost share agreement was required, and throughout all subsequent negotiations never agreed to any of the offers made by the Forest Service for cost sharing based on benefits to the public.

6. *United States v. Purcell Envelope Co.*, 249 U.S. 313, 319, 39 S.Ct. 300, 302, 63 L.Ed. 620 (1919); *Penn-Ohio Steel Corp. v. United States*, 354 F.2d 254, 267 (Ct.Cl.1965).

7. *Thomson v. United States*, 357 F.2d 683, 689 (Ct.Cl.1966); *Penn-Ohio Steel Corp. v. United States*, 354 F.2d at 266–67.

8. *Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1255 (Ct.Cl.1970); *Fincke v. United States*, 675 F.2d 289, 295 (Ct.Cl.1982).

9. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Jascourt v. United States*, 207 Ct.Cl. 955, 521

F.2d 1406, *cert. denied*, 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 405 (1975).

10. *National By-Products, Inc. v. United States*, 405 F.2d 1256, 1263–64 (Ct.Cl.1969); *American Gen. Leasing, Inc. v. United States*, 587 F.2d 54, 59 (Ct.Cl.1978); *Tree Farm Development Corp. v. United States*, 585 F.2d 493, 501 (Ct.Cl.1978).

11. *DeMatteo Const. Co. v. United States*, 600 F.2d 1384, 1388 (Ct.Cl.1979); *American Gen. Leasing, Inc. v. United States*, 587 F.2d at 58; *Ship Const. & Trading Co. v. United States*, 91 Ct.Cl. 419, 456 (1940), *cert. denied*, 312 U.S. 699, 61 S.Ct. 737, 85 L.Ed. 1133 (1941).

Plaintiff's conduct in reconstructing the MGR does not constitute an acceptance of the Forest Service's offer to pay for the benefits to the public that would bring into existence an implied-in-fact contract. Plaintiff did not reconstruct the road in reliance of any offer from the Forest Service. Plaintiff did the work under a Class E special use permit that specifically reserved its claim that the work "should be governed by a cooperative work agreement." Further, plaintiff proceeded in 1976 after 3 years of failed negotiations with full knowledge that no agreement had been reached and none might ever be reached. There was no intent to accept an offer when plaintiff started construction, and no action by plaintiff during or after construction indicates it assent to a Forest Service offer.

Plaintiff asserts that throughout the negotiations the Forest Service agreed to make a contribution to the costs of reconstruction, that the Government has the benefits of an improved structure, and that plaintiff's work was a substitute for work that would have been performed by the Forest Service. Plaintiff also emphasizes that the Forest Supervisor and the Regional Forester at various times had valued benefits to the Government at $1.2 million and at $812,248. Plaintiff argues that the doctrine of equitable estoppel should be applied to prevent the United States from denying the existence of an implied-in-fact agreement.

 The doctrine of equitable estoppel was applied by the Court of Claims, and will be applied by this court, in an appropriate case to prevent the United States from denying the existence of a contractual agreement.[12] For the doctrine of equitable estoppel to be applied, however, the facts must show the following elements to be present: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.[13]

 It is important to distinguish between the doctrine of equitable estoppel, which operates to prevent the denial of a contract that has been made, and the doctrine of promissory estoppel, which creates a contract that otherwise would not exist. Promissory estoppel is used to create a cause of action; equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have, or from instituting an action it is entitled to pursue.[14] Obligations based upon promissory estoppel are founded on contracts implied-in-law (quasi contracts), where a duty is imposed by operation of law without regard to the intent of the parties. The Claims Court has no jurisdiction to render judgment against the United States based upon a contract implied-in-law.[15]

 No contract exists in this case upon which to invoke the doctrine of equitable estoppel. Preliminary agreements relative to a cooperative road construction contract made in the initial negotiations were made by Forest level personnel without final contracting authority, and were disclaimed before plaintiff started any construction. When plaintiff in June 1976 contracted to have the MGR reconstructed under a Class E special use permit, it did not proceed in the mistaken belief that the Forest Service intended to enter a cost share agreement based upon proportionate share

---

12. *Manloading & Management Assoc., Inc. v. United States,* 461 F.2d 1299 (Ct.Cl.1972); *Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72–73, 98 F.Supp. 757–58, *cert. denied,* 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951); General Order No. 1, Oct. 7, 1982.

13. *Emeco Indus., Inc. v. United States,* 485 F.2d 652, 657 (1973); *United States v. Georgia Pacific Co.,* 421 F.2d 92, 96 (9th Cir.1970).

14. *Jablon v. United States,* 657 F.2d 1064, 1068 (9th Cir.1981); *Biagioli v. United States,* 2 Cl.Ct. 304, 307 (1983).

15. *Putnam Mills Corp. v. United States,* 479 F.2d 1334, 1337 (1973); *Algonac Mfg. Co. v. United States,* 428 F.2d at 1256; General Order No. 1, Oct. 7, 1982.

calculations. Plaintiff persistently rejected all offers made by Forest Service officials to share costs on the basis of benefits to the public. To recover on the basis of benefits conferred in a contract implied-in-fact that defendant would be estopped to deny, the circumstances must show not only that the Government had received benefits, but that the action was expressly authorized or implicitly ratified by Government officials with power to bind the Government.[16]

 The Government is not estopped to deny the existence of a contract because it has accepted benefits. Acceptance or receipt of benefits is not sufficient to create a contract that binds the United States in the absence of affirmative authorization. This court is not authorized to imply a contract-at-law on an equitable ground that benefit was conferred.[17]

Other requisites for invocation of the doctrine of equitable estoppel are not presented by the facts in this case. Plaintiff was not ignorant of the true facts when it did the road reconstruction work, nor did plaintiff rely upon representations made by Forest Service personnel. Plaintiff reconstructed the MGR because it wanted to use the road for its own purposes and benefit.

Both parties realized benefits from plaintiff's reconstruction work. The Forest Service obtained the use of an upgraded road, built to a 20-year standard. Plaintiff obtained the use of a pre-existing, partially prepared road that was its preferred route for construction in the Helms project. Plaintiff was not required to share in the investment the public had previously made in the MGR. Plaintiff also received pur-chaser credit from the Smith Timber Sale for work which it would have done in any event. The facts do not show that plaintiff relied on Forest Service representations to its detriment.

 Plaintiff claims defendant is liable because the Forest Service's refusal to make a cooperative road construction agreement was an arbitrary and capricious interpretation and application of Forest Service regulations. Plaintiff relies upon its ownership of property near the Wishon reservoir, its status as a public utility, and provisions in Forest Service regulations which authorize cooperative construction and use agreements to develop areas that are partly administered by the Forest Service and are partly in private or other ownership.[18] Plaintiff emphasizes that the Forest Service in its initial negotiations interpreted the FSM and other regulations to mandate a cooperative cost share agreement. The change in interpretation subsequently ordered by Region 5 personnel is viewed by plaintiff as arbitrary and capricious and to demonstrate a failure to negotiate in good faith.

Use of a cooperative road construction and use agreement is discretionary under the statute and regulations, and the Secretary of Agriculture has decided that its use would be inappropriate on the facts. This decision was reasonable. Plaintiff was not a major intermingled landowner such as would participate in a customary Forest Service cooperative road agreement. Such agreements apply to situations where easements and rights-of-way are exchanged, and both parties share ownership and man-

---

16. *Prestex Inc. v. United States,* 320 F.2d 367, 371 (1963); *New York Mail & Newspaper Transp. Co. v. United States,* 139 Ct.Cl. 751, 757, 154 F.Supp. 271, 275, *cert. denied,* 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957).

17. *National By-Products, Inc. v. United States,* 405 F.2d at 1266; *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925).

18. 36 C.F.R. § 212.9(d) provides, to the extent possible and advantageous to the United States, for joint road construction with propor-tionate sharing of costs attributable to anticipated benefits:

"(d) *Cooperative construction and use agreements.* Where areas, partly lands administered by the Forest Service and partly private or other ownership are undeveloped or inadequately developed by roads, the Chief will, to the extent feasible and advantageous to the United States, join in planning, constructing, reconstructing, improving, maintaining, and using an adequate road system on the basis of each party bearing the proportion of the cost attributable to the anticipated benefits as set forth in § 212.11."

agement of a jointly built road. Plaintiff had no easements or rights-of-way to exchange with the Forest Service with respect to the MGR. The road was already in place on Forest Service lands, and already partially upgraded at Forest Service expense.

The Secretary of Agriculture, and his delegatee, the Chief of the Forest Service, have broad discretion in supervision of the tax supported road systems in national forests that suffer substantial use by private entities. The underlying policy is to protect the public investment, and to share with non-government users, to the extent possible, the public's costs of construction, reconstruction and maintenance of Forest Service roads. Sharing of costs is discretionary; it is appropriate when feasible and a savings to the Government is expected. The Forest Service, under this policy, and the implementing regulations in the FSM, could have required plaintiff to share, not only by bearing the costs of reconstruction of the MGR for its own proposed use, but also by sharing in the original costs of constructing and improving the MGR that were incurred before plaintiff reconstructed the road for the Helms project.

The United States Court of Claims, in the *Mountain States* case [19] after an extensive analysis of constitutional authority and statutory policy, affirmed the broad scope of the Secretary's discretion in regulation of the national forests. The Chief of the Forest Service is vested with authority to make determinations for administration of Forest Service regulations. The Forest Service's interpretation of the regulations through which the Secretary's discretion operates is accorded deference. The administrative interpretation becomes controlling unless it plainly is erroneous or inconsistent with regulation.[20] Further, there is a presumption of regularity in administrative action.

Any contention that the Forest Service improperly interpreted or applied its own regulations is subject to strict standards of proof. In the absence of overwhelming proof, it is assumed that the regulations have been properly interpreted and applied.[21]

The Forest Service in this case determined that a cooperative road right-of-way construction and use agreement was not mandatory and that, on the facts relative to upgrading the MGR, the Required Work method was appropriate. These determinations are reasonable applications of the regulations involved and are fully within the scope of delegated authority.[22]

Plaintiff's contention that Forest Service representatives did not negotiate in good faith is without merit. To change an initial negotiation stance after discovery of error is neither an unusual occurrence in public administration nor improper. To hold otherwise would bind the supervisory levels that have authority to contract to decisions made by unauthorized field personnel, and more important, would perpetuate error. In any event, the error was corrected unequivocally on March 25, 1975, at an early stage in the negotiations.

Defendant's long-range plans to upgrade the MGR were not relevant to plaintiff's immediate need for a reconstructed road. Refusal by the Chief of the Forest Service to allow a contribution based on an estimated capital investment, but canceled as a result of plaintiff's work, was a reasonable application of regulatory authority.

## CONCLUSION

Undisputed facts show that there was no implied-in-fact contract for a cost share road construction agreement with the Forest Service. Plaintiff has not established

**19.** *Mountain States Tel. & Tel. Co. v. United States,* 499 F.2d 611, 613–14 (Ct.Cl.1974).

**20.** *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

**21.** *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); *Mountain States Tel. & Tel. Co. v. United States,* 499 F.2d at 615; *Saracena v. United States,* 508 F.2d 1333, 1336 (Ct.Cl.1975); *Sun Oil Co. v. United States,* 572 F.2d 786, 805 (Ct.Cl.1978).

**22.** 16 U.S.C. § 537 (1976); FSM § 7772.42 (now § 7731.05); FSM § 2733.15.

that the Forest Service erroneously interpreted its regulations or arbitrarily or capriciously exercised its authority. Defendant acknowledges an obligation to pay plaintiff $336,090 for the asphalt concrete surface provided at the request of the Forest Service, and such obligation will be discharged by plaintiff's application to the Forest Service for payment. Further proceedings in this case are neither required nor appropriate. Accordingly, defendant's motion for summary judgment is allowed and plaintiff's complaint will be dismissed.