SPERRY CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 478–86C.

United States Claims Court.

Oct. 15, 1987.

John Lloyd Rice, Washington, D.C., for plaintiff. Richard J. Marcheck, Sperry Corp., and Clarence T. Kipps, Jr., and Scott E. Pickens, Miller & Chevalier, Chartered, of counsel.

Howard Lipper, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Wayne Wenzel, Asst. Counsel, Naval Sea Systems Command, of counsel.

NETTESHEIM, Judge.

## ORDER

This implied-in-fact contract claim comes before the court on cross-motions for summary judgment after argument.

## FACTS

The following facts are undisputed, unless otherwise indicated. In December 1970, Sperry Corporation ("plaintiff") began development of an advanced digital magnetic tape subsystem ("RD–358") used in shipboard command and control systems for an anticipated need by the Naval Sea Systems Command ("NAVSEA"). A prototype unit was delivered to NAVSEA in January 1973, and between 1973 and 1979 plaintiff supplied RD–358 units under annual and definite sole-source contracts. Since the 1960's plaintiff had a practice of incurring material and labor costs in advance of contract award to meet Navy pro-

duction schedules for various products. This practice was followed on the contracts for production of RD–358 units.

Plaintiff received its first sole-source requirements contract (N00024–79–D–7141) in February of 1979, carrying a one-year ordering period. During July 1980, plaintiff began ordering materials and incurring production costs in anticipation of a follow-on contract, since the lead time for RD–358's was estimated by plaintiff to be 16 months from the time materials were ordered. These preaward costs were incurred to fulfill future contract quantity and delivery dates as estimated by plaintiff from RD–358 user information. In November 1980 an informal Navy Acquisition Forecast[1] set forth NAVSEA's anticipated additional needs for digital magnetic tape subsystems, which plaintiff utilized in continuing to incur preaward costs. Plaintiff's January 22, 1981 expenditures study estimated total costs authorized for this anticipated contract at up to $5 million. During a February 3, 1981 meeting, representatives of plaintiff informed NAVSEA Captain James O'Donovan, who was responsible for procurement of RD–358 units from plaintiff, of these costs. Plaintiff had built 14 RD–358's as of June 1, 1981, at an estimated cost of $3.6 million. On July 23, 1981, NAVSEA requested delivery of nine units without a contract. Plaintiff refused unless a letter contract was executed for these units. NAVSEA took no further action. The units, however, were delivered under plaintiff's subsequent contract.

The second sole-source contract (N000240–81–D–7109) was executed on August 5, 1981, with an ordering limit of 100 units and a delivery schedule of 3 units per month. Thereafter, NAVSEA directed delivery of 25 RD–358 units within two months. Indisputably, plaintiff had begun manufacture of the units prior to contract award, and it appears that the material and production costs incurred before formal execution of the contract were recouped by delivering finished units under the second contract. *See infra* note 2. This contract was amended by the parties to add 34 units

through Lot 19 with deliveries through March 1984. A formal Navy Acquisition Forecast of June 1982 set forth NAVSEA's anticipated additional needs for digital magnetic tape subsystems. Plaintiff submitted its proposal for the anticipated third follow-on contract in July 1982 to cover Lots 20–25, with deliveries commencing in April 1984.

Plaintiff asserts that a series of telephone calls beginning in December 1982 through April 1983, from NAVSEA to plaintiff established a merger of the current contract delivery schedule with the future units not covered by a formal contract. Second Affidavit of Marvin W. Mirsch, Sr., Aug. 12, 1987, ¶ 8. Mr. Mirsch, plaintiff's Product Manager, NAVSEA Peripheral Products, Defense Systems Division, explained the elements constituting this merger:

> [T]he Navy's merged schedule was to accelerate delivery of thirty-four units from Lots 20 to 22, all of which were to be delivered within approximately sixteen months. The Navy achieved that result by: (1) instructing me to delay the delivery of eight identified units from Contract–7109 to specific dates after the end of the Contract–7109 delivery period to make room for accelerated delivery of units from Lots 20 to 22 which the Navy said had more critical required delivery dates; (2) instructing me to increase Sperry's monthly delivery rate in November 1983 during the Contract–7109 delivery period, and again in March 1984; and 3) instructing me to deliver eight specified units from Lots 20 to 22 at specified dates during the Contract–7109 delivery period....

*Id.* The actions taken allegedly to implement this scenario are set out below.

In a September 21, 1982 production meeting on the second contract, NAVSEA representative Jerry Manning stated that increases in the production rate from three to five units would be required in August 1983, prior to completion of the second contract, in order to meet future RD–358 user requirements. First Affidavit of Mar-

---

**1.** Navy Acquisition Forecasts were for the benefit of all contractors.

vin W. Mirsch, Sr., Apr. 15, 1987, ¶ 12. Mr. Mirsch advised that additional test stations would be needed to increase the production rate. *Id.*

An additional production increase was discussed at a December 7, 1982 Quarterly Product Review, which was attended by contracting officer Tom Slattery, Captain O'Donovan, and technical advisers Thomas L. Wallis and James Wong. Mr. Mirsch was informed that a production rate of six units per month "commencing as soon as possible" would be required to fill RD–358 user requirements. First Mirsch Aff. ¶ 13. According to Mr. Mirsch, NAVSEA was advised that the production rate could not be accelerated to six units unless plaintiff acquired additional testing stations and ordered material in January 1983 for the units to be built under the anticipated third RD–358 requirements contract. *Id.*

NAVSEA and plaintiff's representatives met again on December 16, 1982. Mr. Mirsch avers that Messrs. Wallis and Wong "repeated the directions that Sperry start all necessary action to accelerate production." First Mirsch Aff. ¶ 14. Mr. Mirsch also states that a NAVSEA representative, identified as Walt Hopkins, noted that AEGIS, a group which had funding for RD–358's, could "directly fund the required stations" and "receive a credit on the price finally negotiated." *Id.* Mr. Mirsch concludes that he "was directed to obtain Sperry management approval to acquire material for Lot 20 [the third contract] and to provide a definite plan for test stations the first week in January." *Id.* On January 26, 1983, plaintiff approved the material acquisition for Lot 20, which allowed for incurring over $2.5 million in expenditures for producing 30 units. *Id.*

Defendant gives a different account of the December 7 and 16, 1982 meetings. Captain O'Donovan avers, with regard to the December 7 meeting:

It was my understanding that Sperry relied upon the projected future needs of the RD–358 in an effort to estimate its future sales and production of the RD–358 and to formulate its own business decisions....

....

It was never the intention of myself or my subordinates ... to enter into such a contract with Sperry during the December 1982 meetings. The Navy had previously negotiated two requirements contracts with Sperry for the purchase of the RD–358. The Navy and Sperry anticipated entering a third requirements contract for the RD–358, however, the authority to enter such an agreement was never obtained. It was only under the terms of such a contract that the Navy intended to purchase the RD–358. Any expenses related to accelerated production of the RD–358 incurred by Sperry were to be recovered under the terms of a contract already in existence and under the terms of a third requirements contract, if and when one was formed.

Affidavit of Captain James O'Donovan, July 16, 1987, ¶¶ 4, 6. Captain O'Donovan states that he "never directed Sperry to incur" expenses for projected needs, *id.* ¶ 8, and Mr. Mirsch's later affidavit concurs that Captain O'Donovan "never gave formal directions in the precise words that he uses in his affidavit....", Second Mirsch Aff. ¶ 5, adding that Captain O'Donovan did state the necessity of plaintiff's continuing to incur costs prior to contract coverage. *Id.*

NAVSEA Acquisition Manager Thomas L. Wallis supports the nonbinding nature of these meetings with reference to representations made by plaintiff's Program Manager Donald Dunn prior to the December meetings:

Don Dunn assured Captain O'Donovan that the information received from the Navy would only be used by Sperry as a comparison against Sperry's own marketing projections. He further assured Captain O'Donovan that Sperry's decision to incur expenses in reliance upon the Navy's forecasted needs and in advance of the signing of a contract would be taken at its own risk.

Affidavit of Thomas L. Wallis, July 13, 1987, ¶ 9. Contracting officer Slattery states:

Even though Sperry had indicated to me that it was incurring costs for future potential contracts, I can state with certainty that I would not have directed Sperry to incur costs relating to a contract which was not yet in [existence]. . . .

Affidavit of Tom Slattery, July 16, 1987, ¶ 6.

Regardless of defendant's position concerning the December 7 and 16th meetings, the monthly delivery rate was increased and contractual RD–358's were mixed with noncontractual units. The December 1982 QPR Production Schedule shows a November 1983 delivery rate of four units each month while the April 1983 QPR Production Schedule showed a November 1983 rate of five per month. The April 1983 QPR also lists a six-unit scheduled production for March 1984.

Mr. Mirsch described how the parties agreed to withhold units under the current contract in order to accelerate the future lot numbers:

The Navy's instructions are shown in the published schedules. For example, the December 1982 Production Schedule provided for delivery of Serial Number A372 (contract line item O1CC) in February 1984. The unit is identified by end user code (CG/SM2–15), equipment configuration code (7059800–09), serial number (A372) and the applicable line item number of Contract–7109 (O1CC). After the December 1982 QPR, Navy instructions were to reschedule delivery of this unit to April 1984 (contrary to the contract requirement). The rescheduled delivery date and new serial number (A387) are shown in the April 1983 QPR.

Second Mirsch Aff. ¶ 12 (citations to exhibits omitted). All of the QPR's were circulated among the parties, including the contracting officer.

A subsequent letter dated March 17, 1983, from Mr. Wallis to plaintiff, memorialized the parties' discussions:

1. During . . . [the Dec. 7, 1982 meeting], NAVSEA reemphasized the need to accelerate production deliveries of the RD–358(V)/UYK and stated that all efforts should be undertaken to increase the production rate. Sperry indicated that additional test sets would be required to accelerate production and that they would undertake the necessary actions to accomplish this acceleration. During . . . [the December 16, 1982 meeting], Sperry indicated that they would start immediately all actions to accelerate deliveries, including the procurement of the additional test sets. In addition, Sperry indicated that a position paper on a proposed alternative to the original plan was in preparation with an anticipated delivery date of 1 February 1983. Consideration of this alternative, vice the original plan, was to be predicated upon NAVSEA review of the position paper. Based upon this meeting, NAVSEA was under the impression that Sperry was initiating action to obtain the additional test sets and that acceleration could commence under . . . [NAVSEA Contract N00024–81–D–7109].

2. During . . . [the February 1, 1983 meeting], Sperry indicated that the position paper was in preparation and that procurement of the test sets and the software programming had not begun. NAVSEA reiterated that the original plan was still in effect until the position paper was received and that acceleration could begin Summer 1983. During . . . [the phoncon of March 1, 1983], Sperry indicated that acceleration would begin when the follow-on contract for 180 units was in-place.

3. It was NAVSEA's understanding that acceleration efforts were begun in the late December 1982/early January 1983 time frame and that acceleration to six per month could begin in early Fall 1983. Based on . . . [the phoncon of March 1, 1983], acceleration efforts would not begin until contract signature (estimated to be June 1983) and that actual acceleration could not commence until eight months thereafter.

4. NAVSEA still desires delivery rate acceleration as soon as possible, NAVSEA has not received the alternative proposal position paper and is under

the assumption that the original plan is still in effect.

5. It is requested that Sperry provide NAVSEA PMS 408 with the status of the RD–358(V)/UYK acceleration effort and its plans for acceleration. The subject of the RD–358(V)/UYK delivery acceleration will be included in the next Quarterly Program Review (QPR) tentatively scheduled for the week of 4 April 1983. It is hoped that the final disposition of this matter can be made prior to the QPR and that a report of proceeding be made at this time.

6. Nothing in this letter is to be construed as obligation [sic] the Government to any particular course of action, or as a commitment to enter into any kind of contract.

Plaintiff proffers the following language to confirm an implied-in-fact contract: 1) "the original plan is still in effect"; 2) "all efforts should be undertaken to increase the production rate...."; 3) "acceleration could commence under ... contract"; and 4) "acceleration could begin Summer 1983...." Defendant gives the letter another gloss:

> In the first section of the letter the Navy notes that Sperry is accelerating production under the parties['] *existing contract.* Future procurements are not discussed. In the second paragraph the Navy notes that Sperry "indicated that acceleration [relating to the follow-on contract] will begin when the follow-on contract for 180 units was in-place." In the third paragraph the Navy notes that Sperry has stated that "acceleration efforts would not begin until contract signature (estimated to be June 1983) and that actual acceleration could not commence until 8 months thereafter." ... [T]he letter concludes by reminding Sperry that it is not to be construed as creating any contractual obligations binding upon the Government....

Def's Br. filed July 17, 1987, at 6 (emphasis in original; citations to exhibits omitted).

The April 1983 Quarterly Product Review, prepared by plaintiff and submitted to the contracting officer, stated that plaintiff expected the "test stations costs to be included with Sperry proposal ... for amortize [sic] over (180) units." According to Mr. Mirsch, plaintiff approved the expenditure for future Lots 21–22 on May 12, 1983, based upon NAVSEA's lack of objection to the report. First Mirsch Aff. ¶ 18. The Quarterly Product Reviews of July and October continued to report the acceleration process costs. *Id.* ¶¶ 19–20. However, plaintiff was aware of the possibility of a competitive procurement. Plaintiff's internal memorandum dated August 1, 1983, discusses "the possibility of a competition to replace the RD–358" because of inquiries from Congress.

Since the total estimated price of the anticipated third follow-on contract exceeded $25 million, NAVSEA prepared a January 1, 1983 Request for Authority To Negotiate ("RAN"), which was transmitted to Naval Material Command ("NAVMAT") for approval pursuant to Navy Procurement Directive No. 1–403.51(b)(1)a (Mar. 10, 1980). NAVMAT returned the RAN on January 1, 1983, and directed NAVSEA to "look at RD–358 as candidate for competition."

After receiving NAVSEA's Acquisition documents and pre-negotiation clearance submission, NAVMAT informed NAVSEA by memorandum of August 25, 1983, that a competitive bidding process should be pursued. Thereafter, NAVSEA transmitted a modified proposal which would sole-source procure only 120 units from plaintiff. On September 21, 1983, NAVMAT denied authority, directing that "[a] more aggressive competitive approach is required...." A letter of September 23, 1983, from plaintiff to the Commander of NAVSEA took the position that a decision for competitive procurement violated past practices:

> Based on previous business practices, Sperry committed to provide the Navy follow-on RD–358 production deliveries starting in March 1984 contiguous to the current N00024–81–D–7109 production schedule. Sperry's commitment included incremental authorization of lots 20, 21, and 22 (90 units) material procurement and activities to increase production from

4 units to 6 units per month to meet the Navy's immediate and critical RD–358 needs.

The December 12, 1983 issue of the *Commerce Business Daily* published the Navy's Notice of Intent to issue a competitive Request for Procurement ("RFP") for equipment emulating the RD–358, and a subsequent RFP was published on March 13, 1984. Plaintiff and Miltope, Incorporated, were the only bidders that submitted proposals. After review NAVSEA awarded the contract to Miltope, and plaintiff thereafter submitted an informal, followed by a certified, claim for costs incurred in anticipation of the third requirements contract. The claim was denied on May 20, 1986, and plaintiff commenced this action seeking recovery of $4,040,000 on August 1, 1986.

## DISCUSSION

Plaintiff argues that it had an implied-in-fact contract with NAVSEA for acquisition of materials, creation of additional testing stations, and final production of RD–358 units under NAVSEA's acceleration program. Plaintiff does not argue that it had a promise for future award of the third requirements contract. Plaintiff's position is that the pre-production work it performed under the inducement that payment would be included in the follow-on contract constitutes an implied-in-fact contract. More specifically, plaintiff claims that it incurred these costs based upon the delivery schedule imposed on it by defendant.

Summary disposition requires that no genuine dispute exists as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987); *Johnson Controls, Inc. v. United States*, 8 Cl.Ct. 359, 365 (1985), *aff'd mem.*, 795 F.2d 1011 (Fed.Cir.1986). A material fact is a circumstance which will generate a difference in the case result. *Singleton v. United States*, 6 Cl.Ct. 156, 167 (1984). An evidentiary conflict "set forth in detail on the record ... by a knowledgeable affiant" raises a question of material fact. *Johnson Controls*, 8 Cl.Ct. at 365 (citing, *inter alia, Burmag Barmer Maschinenfabrik AG v. Murata Machinery Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984)). The Federal Circuit recently stated: "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material fact." *Mingus Constructors*, 812 F.2d at 1391 (citation omitted).

The facts that the parties met and that accelerating delivery of the RD–358 units was discussed are uncontested. NAVSEA also was aware that plaintiff was incurring costs for future potential contracts.

An implied-in-fact contract requires a showing of " 'mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the Government in contract.' " *Johnson Controls*, 8 Cl.Ct. at 366 (quoting *Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984)). Mutuality is inferred "from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923).

An offer must be unambiguous, and acceptance must be manifested unambiguously by conduct that indicates assent. *Pacific Gas & Elec. Co. v. United States.*, 3 Cl.Ct. 329, 339 (1983) (citing cases). Although inducement is not an element of a contract implied in fact, inducement and encouragement to do work may constitute implied acceptance. *See Thomson v. United States*, 174 Ct.Cl. 780, 788, 357 F.2d 683, 689 (1966); *see also Johnson Controls*, 8 Cl.Ct. at 368. Continuous acceptance by the Government of a contract or services with knowledge that payment was expected without ever disclaiming an intention to pay after the contractor's demand for payment has been held to support an implied-in-fact contract. *See Pacific Maritime*

*Ass'n v. United States*, 123 Ct.Cl. 667, 675, 108 F.Supp. 603, 607 (1952); *see also Johnson Controls*, 8 Cl.Ct. at 368.[2]

The evidence generally required to support an implied-in-fact contract was described by the Court of Claims in *Russell Corp. v. United States*, 210 Ct.Cl. 596, 608–09, 537 F.2d 474, 481–82 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977):

> A contract implied in fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement. It is essential however, that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain. *The requirements of mutuality of intent and the lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs.*

(Emphasis added; footnotes omitted.)

■ Relying on Mr. Mirsch's affidavit, plaintiff argues that offer and acceptance are established based upon either the oral instructions originally given during the December 7 and 16 meetings or based upon the written delivery schedule that was designed by defendant and followed by plaintiff with the expectation of being paid. Defendant relies on the affidavits of Captain O'Donovan and Messrs, Wallis and Slattery to support the proposition that plaintiff relied on the projected future needs for the RD–358 units to formulate its own business decisions and that NAVSEA never represented that by projecting its future needs it committed to purchase future quantities. Defendant's affiants dispute any interest in

purchasing test stations and material to support acceleration, as opposed to finished units under the existing second requirements contract, or a definite quantity contract, or a third requirements contract.[3] Since plaintiff's and most of defendant's affiants were present at the December meetings and were involved in formulating and implementing the delivery schedule, genuine issues of material fact exist for trial.

■ Another issue is whether any agreement had the immediacy effect of obligating NAVSEA apart from the third follow-on contract. Since no contract can be implied where the parties contemplate that their contractual relationship would arise by means of a written agreement, *Pacific Gas & Elec.*, 3 Cl.Ct. at 339 (citing cases), it will be crucial to ascertain whether and to what extent the parties' prior arrangements to effect payment through a later-awarded contract shaped any understanding.

Thus, plaintiff must prove 1) that the parties intended to contract, 2) that they were not looking toward a written contract, 3) that NAVSEA induced plaintiff's performance (like the showing made in *Thomson*), or 4) that NAVSEA acknowledged that plaintiff expected to be paid for labor and materials incurred in accelerating production (like the showing made in *Pacific Maritime Ass'n*). Plaintiff's task will be to undercut defendant's affiants, all of whom disclaim inducement and may be able to give like context to the subsequent schedules and related documents.

If acceptance were to be established, it remains uncertain whether the assent was limited by the disclaimer contained in the March 17, 1983 letter. Plaintiff argues that the disclaimer is ineffective since the

---

**2.** Plaintiff would base an implied-in-fact contract on the parties' past conduct or dealings. As defendant points out in distinguishing plaintiff's cases, plaintiff and NAVSEA never entered into a requirements contract similar to that urged in this case. Apparently, plaintiff was paid previously for material and labor costs incurred before award of the definite quantity contracts from 1973–1979 prior to execution of the follow-on contracts, *see* First Mirsch Aff. ¶ 7, and plaintiff apparently was paid for finished

units produced before award of the second requirements contract and delivered under it. *See id.* ¶ 10.

**3.** Defendant's affiants also disavow an intent to contract. It is immaterial whether defendant's agents intended to create an implied contract as long as their statements or actions support its formation.

**460**

letter, at best, embodied both strong encouragement to accelerate and a boiler-plate provision regarding the lack of any binding agreement upon NAVSEA. Additionally, defendant's delivery schedules, which plaintiff urges caused it to incur acceleration costs, were produced and transmitted to plaintiff after the alleged disclaimer.

■■■ Actual authority to bind the Government may be proved or rebutted by statute or regulation. Defendant asserts that the accelerated procurement never received post-negotiation clearance. Navy Procurement Directive 1–403.50(b) (Rev. 2 Sept. 30, 1974), states: "NO COMMITMENT SHALL BE MADE TO A PROSPECTIVE CONTRACTOR PRIOR TO OBTAINING THE CHIEF OF NAVAL MATERIAL'S APPROVAL OF THE POST–NEGOTIATION BUSINESS CLEARANCE MEMORANDUM." However, regulation NPD 1–403.51(b)(1)b (Mar. 10, 1986), states that business clearance by the Chief of Naval Material is required only if the procurement exceeds $25 million. Since defendant's acceleration request, whether or not it rises to the level of a contract, is well below this amount, contracting authority was present.

### CONCLUSION

Accordingly, based on the foregoing,

IT IS ORDERED, as follows:

1. Pursuant to RUSCC 56(e), the facts, other than non-admission statements and assertions attributed to affiants, in the body of this order appear without substantial controversy and are deemed established for the purposes of trial. In addition, there is no substantial controversy that a post-negotiation business clearance was not required and that fact also shall be deemed established for trial. Whether there was mutuality of intent to contract, offer, and acceptance are material facts actually and in good faith controverted that must be resolved at trial.

2. The parties' cross-motions are denied in all other respects.

3. All discovery shall be completed by December 31, 1987.

4. The meeting of counsel called for by ¶ 10 of Appendix G shall be held as soon as practicable after Mr. Mirsch's deposition.

5. Filings pursuant to Appendix G, to be filed by January 6, 1988, shall be limited to those called for by ¶¶ 11–13. The Memoranda of Fact and Law, not to exceed 10 pages, shall discuss only the case law on 1) acceptance by inducement to perform as applied to the facts relating to plaintiff's adhering to NAVSEA's production schedules and 2) acceptance of services with knowledge that the contractor expects to be paid therefor. Individual statements of additional issues may be filed if either party requests findings beyond the issues set forth in ¶ 1 of this order. However, notice thereof shall be given to the other party by no later than the meeting of counsel.

6. The pretrial conference shall be held at 1:00 p.m. on Friday, January 22, 1988, in the National Courts Building, 717 Madison Place, N.W., Washington, D.C.

7. Trial, not to exceed five days, shall commence at 10:00 a.m. on Monday, February 1, 1988, in the National Courts Building.