OAO CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 235–86C.

United States Claims Court.

May 24, 1989.

David V. Anthony, Washington, D.C., with whom were Gregory A. Smith and Elizabethanne C. Stevens, for plaintiff.

Peter G. Barber, Washington, D.C., with whom were Asst. Atty. Gen. John R. Bolton, and Billy Smith, Jr., for defendant.

## OPINION

RADER, Judge.

This nation's early warning system against missile or air attacks is vital to its defense. In 1981, the United States Air Force (Air Force) concluded that the computer at the center of this system might be vulnerable to a data overload. Therefore, the Air Force Computer Acquisition Center (AFCAC) rushed to procure a computer system to relieve the burden. Plaintiff, OAO Corporation, Inc. (OAO), received a sole source opportunity to bid on the project.

In November 1983, the Air Force and OAO reached an agreement on all procurement terms. The time sensitivity of the project required OAO to begin performance immediately. The Air Force issued a formal contract document memorializing the agreement. OAO executed the document. The Air Force received the document for signature, but did not sign. In the interim, Air Force policy had changed. On the basis of a new evaluation, the Air Force determined it did not need the new computers. The Air Force cancelled the procurement agreement.

OAO sought reimbursement in the United States Claims Court under 28 U.S.C. § 1491(a) (1982), for work it performed before execution of the formal contract. After trial held March 20–22, 1989, this court determines that OAO and the Air Force entered an implied contract for start-up costs. The parties entered this implied-in-fact contract at the close of the November negotiations. Due to changes in Government policy, the parties did not formalize a contract for the entire $13 million project. Nonetheless, the implied-in-fact contract for some start-up costs was complete and enforceable after the November 1983 meetings. Therefore, defendant must compensate plaintiff for work performed under the implied-in-fact agreement.

### FACTS[1]

The United States constantly watches air traffic to prevent surprise missile or air attacks on North America. The Air Force relies upon satellites, radar listening posts, airborne listening devices, and other sources to supply information to this early warning system. The Command Center Processing and Display System (CCPDS) is the computer at the core of the Air Force's early warning system. CCPDS sorts and interprets the information from the system's many monitoring locations. Any threat to CCPDS poses unacceptable national security risks.

In 1981, the Air Force conducted a study of this tactical early warning system. The 1981 study determined that computers at CCPDS were in danger of overload. With

---

1. In light of the fact-intensive nature of this case, this court refers extensively to testimony of witnesses in footnotes. This court's citations are not necessarily the only testimony given on each referenced point. Having considered the entire record, including some contrary testimony on these points, this court finds these facts.

an increasing number of satellite and radar sensors around the world, the study concluded that a flurry of data could overburden the system. Correction of this potential problem became a high priority for the Air Force.

To ease the increased load on CCPDS, the Air Force invited contractors to bid on a new system of "Front End Processors" (FEPs) in December 1982. The Air Force intended FEP computers to sift and control inputs to the primary computers at each of the four CCPDS command centers. FEPs would cancel duplicate messages, place priorities on inputs, and otherwise enable CCPDS computers to process more data more efficiently.

The Air Force received only one satisfactory response to its solicitation. Plaintiff did not submit a proposal. OAO considered the Air Force's delivery schedule too demanding to warrant a bid proposal.[2]

The Air Force asked several contractors why they had declined to submit a bid. Plaintiff informed the Air Force that its delivery schedule was unreasonable. The Air Force had based its delivery schedule on the assumption that the necessary equipment was available "off the shelf" from commercial stocks. Plaintiff, however, informed the Air Force that the job required specially designed equipment.

Plaintiff was a disadvantaged contractor under the Small Business Administration's (SBA) 8(a) program, 15 U.S.C. § 637(a) (1982). Therefore, plaintiff proposed negotiating a sole source contract with a realistic delivery schedule under the 8(a) program.[3] In an April 5, 1983 letter, the Air Force posed 23 questions concerning OAO's ability to perform a major contract. The parties arranged a meeting to discuss the questions and the proposal.

At this April 20 meeting, plaintiff responded to the Air Force's questions. Plaintiff documented, among other things, 20 major contracts it had already performed similar to the software requirements of the CCPDS–CPP. Five days later, the Air Force notified plaintiff that it had decided to accept OAO's proposal. Mr. Phillip Davis, an experienced government contractor with OAO, noted that this announcement came quickly after the initial meeting.[4] This prompt decision shows that the Air Force considered this project extremely time sensitive. The Air Force would buy the new computers from OAO as a sole source under the 8(a) set aside program.

Under an 8(a) program, SBA enters into a contract with a procuring agency, in this case the Air Force, to provide goods or services. SBA subcontracts these requirements to a participant in the 8(a) program. SBA then steps aside and permits the 8(a) contractor, in this case OAO, to negotiate directly with the procuring agency.

This 8(a) program benefitted both plaintiff and the Air Force. OAO received a sole source contract for the Air Force's procurement. With pressing time demands, the Air Force received the opportunity to obtain a new computer system more swiftly than competitive bidding would allow.[5] The Air Force's immediate willingness to pursue an 8(a) procurement is further evidence of the time demands of this project.

After asking SBA to proceed with the procurement under the 8(a) program, the Air Force provided OAO with a copy of the contract specifications. On June 22, 1983, the Air Force issued a sole source solicitation to OAO under the 8(a) program. The project name changed from FEP to "Communications Pre–Processors" (CPP). Other than the name change, however, the project remained virtually the same. The solicitation indicated that the Air Force expected to purchase at least one and possibly five CPP installations. With two CPPs required for each installation, the solicitation potentially entailed ten computer systems.

---

**2.** *See, e.g.,* Transcript of Proceedings, No. 235–86C, Mar. 20–22, 1989 (Tr), at 57, 135–36.

**3.** *See, e.g.,* Tr., at 58–59.

**4.** Tr., at 146.

**5.** *See, e.g.,* Tr., at 60–61.

Plaintiff submitted its formal proposal on August 2, 1983. On August 18, 1983, the parties conducted preliminary discussions about the proposal. In September, plaintiff revised its proposal. Between October 12 and 14, 1983, OAO and Air Force technical personnel met to discuss meshing the proposed CPPs with CCPDS's Univac computers.

In October, OAO's CCPDS–CPP engineer, Ms. Jean Schelin (now Logan), placed a conditional order with Data General for manufacture of hardware for the project. The Air Force solicitation demanded delivery as early as 60 days after formal entry into the contract. Without doubt, time was of the essence to the Air Force in this bidding process. Mr. John Danko, OAO's lead negotiator, testified that, because the CPP program was "crucial to the national defense," the Air Force would not negotiate a more lenient schedule.[6] Mr. Davis,[7] Ms. Jean Schelin,[8] and Captain (now Major) Charles Mather, Jr.,[9] the contracting officer, confirmed the importance of time and early delivery to the Air Force. With national security at stake, the Air Force would not tolerate delays.

Data General, the manufacturer, could only guarantee delivery within 90 days of an initial order. Therefore, plaintiff had to place its computer order before completion of the contract negotiations. Ms. Schelin placed a conditional order with Data General in October. This order reserved OAO's place in Data General's manufacturing queue. OAO made the order with Data General conditional on successful completion of the pending contract negotiations.

On November 15, 1983, the parties began four days of intensive negotiations. During the first few days of the negotiations, the parties exchanged information. At that point Captain Mather appeared with the contract manager, Lieutenant (now Captain) Michael Tollinger. Captain Mather introduced Lieutenant Tollinger as "his

guy." Further, Captain Mather assured plaintiff: "You make a deal with him, you have a deal with me."[10] This occurrence inaugurated the serious bargaining toward a contract. Captain Mather attended very little of the negotiations, but Lieutenant Tollinger took frequent breaks to receive detailed instructions from his superior. Captain Mather directed the negotiations through Lieutenant Tollinger.[11]

As the negotiations developed, the primary issues were contract price and delivery schedule. The solicitation specified delivery within 60 days of contract approval and a time-consuming Live Test Demonstration (LTD) before delivery. Plaintiff could not meet that schedule. First, Data General could not deliver to plaintiff in less than 90 days. Second, once it received the computers, OAO needed at least another 30 days to program the CPPs and make hardware adjustments. Finally, the LTD required still more time. Either some work had to occur before formal contract approval or the schedule had to grant plaintiff more delivery time.

At the outset of the bargaining, plaintiff tried to remain close to the strict delivery date. To offset the risks inherent in strict time constraints, plaintiff proposed a contract price of $29 million. OAO reasoned that it needed additional pay for accepting the risks of failing to meet the delivery schedule. The proposed but unexecuted contract contained a liquidated damages clause holding plaintiff accountable for the time limits. In addition, plaintiff understood that the project would require considerable software and hardware design work.

The Air Force had estimated the contract price at $10 million. According to the Air Force, little design work was necessary because most of the equipment for the contract was available "off the shelf." Due to these differing notions of the

6. *See, e.g.,* Tr., at 75, 583, 586, 595.

7. Tr., at 150–51.

8. Tr., at 199, 556.

9. Tr., at 334–35.

10. *See, e.g.,* Tr., at 71–72, 149, 197, 272, 356.

11. *See, e.g.,* Tr. 325, 356.

project's requirements, the price and delivery date issues surged back and forth.[12]

During the third day, the Air Force made a final "take it or leave it" offer. This proposal reduced the contract price to $13 million. At some point earlier in the negotiations, most likely when the Air Force presented its final offer, Lieutenant Tollinger also clarified that additional clearances, beyond the contracting officer's approval, would be necessary to make the contract final and binding.[13] At this point, according to Mr. Danko, the negotiations were "very close to a breakdown." [14] This ended the third day of negotiations.

On the fourth and last day of bargaining, Mr. Danko proposed to drop the LTD and deliver the first CPP 90 days after the contract date. This offer was possible because plaintiff had already secured a conditional place in Data General's manufacturing queue.[15] Mr. Danko told the Air Force that work in advance of the formal contract approval was necessary to satisfy these modified time limits.[16] Mr. Davis [17] and Ms. Schelin [18] corroborated this account. Although given, this explanation was un-

necessary. The time requirements of the manufacturer, the development time required by OAO, and the proposed contract's delivery schedule clearly demanded work to begin prior to the contract date.

The Air Force delegation retired to discuss the proposal with Captain Mather. When Lieutenant Tollinger returned, an issue about maintenance costs arose. Discussions on this issue consumed much of the final day. Finally, the Air Force delegation again retired to consider the outstanding offer. Captain Mather and Lieutenant Tollinger then reentered the meeting. Captain Mather announced acceptance of the offer. All the negotiators, including the contracting officer and OAO's lead negotiator, Mr. Danko, shook hands around the table. Captain Mather characterized the handshaking as an indication of completion of the deal:

> The Court: Why did you have handshakes?
>
> [Captain Mather]: It signified the completion of the deal.
>
> The Court: What deal?
>
> > [Mr. Smith]: Right, at the end of the negotiations.
> > [Mr. Davis]: I don't recall that.
>
> *Id.* at 161. This suggestion explains as well why Ms. Schelin might not have heard the cautionary statement. She was in and out of the room making phone calls to Data General early in the negotiations. Therefore, this court finds that Lt. Tollinger presented his cautionary remarks earlier in the negotiations, probably at the time he made the final offer. Subsequently Mr. Danko made a counter-offer and clarified that pre-contract work would be necessary.

---

12. *See, e.g.,* Tr., at 75–78, 358–61.

13. Both the timing and the occurrence of this cautioning statement produced conflicting testimony. Plaintiff's negotiators do not recall ever hearing Lieutenant Tollinger's remarks about additional clearances. *See, e.g.,* the following testimony from Ms. Schelin:

> The Court: At any point, did he [Lt. Tollinger] discuss any further steps that the Air Force would need to take before the contract would be complete?
> [Ms. Schelin]: No.
> The Court: He didn't mention anything about needing additional funding clearances or needing to get clearance from above?
> [Ms. Schelin]: No.

Tr., at 547–48. Captain Mather and Lieutenant Tollinger recall that this statement occurred on the last day just prior to the handshaking. Tr., Mar. 21, 1989, at 280–82 (testimony of Captain Mather); *id.* at 361–62 (testimony of Lieutenant Tollinger). Mr. Davis suggests that the Air Force might have given the cautionary advice, but earlier in the negotiations:

> [Mr. Smith, plaintiff's counsel]: Did the Air Force through Captain Mather or Lieutenant Tollinger or otherwise state that this acceptance was subject to approvals?
> [Mr. Davis]: At that point in the negotiations?

14. Tr., at 77.

15. Throughout the negotiations, the Air Force knew of plaintiff's conditional order of hardware from Data General. Repeatedly during the negotiations, plaintiff, with the knowledge of the Air Force, consulted Data General about timing or technical questions. *See, e.g.,* Tr., at 160, 363. For an explanation of the business arrangement with Data General, *see, e.g.,* Tr., at 90–94.

16. *See, e.g.,* Tr., at 77–78.

17. *See, e.g.,* Tr., at 158.

18. *See, e.g.,* Tr., at 202–03.

[Captain Mather]: The agreement on price, terms and conditions.

Tr., at 282.

Mr. Danko asked to speak to Captain Mather and Lieutenant Tollinger out of the room. He protested that OAO had been "cut to the bone." He cautioned the Air Force not to request any "special favors" in this contract.[19]

As the handshaking proceeded, Ms. Schelin announced to the group that she would now call Data General to confirm plaintiff's hardware order. The contracting officer and the rest of the Air Force delegation was present and heard her announcement. She left the room and made the phone call.[20] Lieutenant Tollinger corroborated this evidence.[21] Data General thus received confirmation of plaintiff's computer order.

Captain (now Major) Charles Bateman, Strategic Air Command's (SAC) representative at the negotiations, requested a site preparation meeting. This meeting would enable plaintiff to plan for adaptations for each unique installation site. The Air Force also needed to get information about plaintiff's cabling and power requirements to ensure that the installation sites would be compatible. This meeting would also facilitate exchange of technical data. Captain Mather authorized the meeting.

After the negotiations, the parties had agreed on all terms. The parties had settled on price, delivery schedules, and all other specifications. The Air Force agreed to draft the formal language of the agreement. At that point, the Air Force expected final contract approval in December 1983.[22]

A month later, in December, Data General requested from plaintiff additional assurance of the contract. The Air Force still had the contract document under review. Mr. Danko called Lieutenant Tollinger and requested a letter to reassure Data General of the negotiated agreements.[23] Lieuten-

ant Tollinger told Mr. Danko: "[W]e could send them some type of letter, that we were going through the reviews, but we couldn't bind the Government at that point in time...." Tr., at 373–74.

On December 19, 1983, Captain Mather wrote a letter to plaintiff in response to this request. The first three sentences of the letter recount the completion of the negotiations. The fourth sentence stated that the Air Force "anticipate[d] contract award in mid-January 1984 pending availability of funds and required review and manual approvals." The letter stated further: "This memo is provided as a 'status' report only and does not commit the Government to a contract award."

On the same date as Captain Mather's letter, December 19, OAO sent a letter telling the Air Force of a "software design review" meeting scheduled for January 5. This meeting apparently arose out of a request for a meeting on site preparation at the November negotiations. At that time, on the last day of negotiations, Captain Mather consented to a site preparation meeting. Five Air Force representatives, led by Captain Bateman, attended this planning session. The parties scheduled other meetings for February 15 and 16. These meetings were later rescheduled and held on February 23 and 24.

On December 12, 1983, the Air Force delivered to plaintiff a draft document containing the agreement reached November 18, 1983. This document stated that the contract must receive approval from the Secretary of the Air Force or his designate. OAO Vice President William Slade signed the document on January 25, 1984. Plaintiff sent the original of this document to the Air Force for signing. The contract document remained, unsigned, in the possession of the Government.

In January 1984, Air Force policy began to shift. In particular, the System Integration Office (SIO) questioned the need

19. *See, e.g.,* Tr., at 283.

20. *See, e.g.,* Tr., at 80, 162, 203–04.

21. *See, e.g.,* Tr., at 362, 394–95.

22. *See, e.g.,* Tr., at 288, 329, 371.

23. *See, e.g.,* Tr., at 94, 121.

for CPPs.[24] A January 25, 1984 letter from Lieutenant Colonel (now Colonel) Kenneth Schaebethal noted that a recent ruling by SIO reduced the demand for CPPs. SIO had ruled against removing cyclic redundancy checks from CCPDS's data input system.[25] According to the January 25 letter, this ruling "greatly limit[ed] the utility" of the CPPs which were designed, among other things, to cut redundancies. The same letter also noted: "[C]hanges ... have reduced the number of interfaces into CCPDS to less than half of the number envisioned at the inception of this project."

On March 1, 1984, General Charles May recommended cancelling the CPP project. At least three other Air Force commands disagreed with this recommendation.[26] Thus, SAC headquarters called a meeting to discuss the future of CPPs. This meeting, held March 6, 1984, produced an agreement to reevaluate immediately CCPDS's workload.

Meantime, by the middle of January, plaintiff signed and returned the contract document generated by the Air Force to memorialize the November 18, 1983 agreement. OAO held its next technical exchange meetings with SAC on February 23 and 24. The AFCAC contracting officer learned of these meetings. Knowing now of the pending reevaluation, Captain Mather sent a letter to OAO on February 28, 1984. This letter stated: "[A]ward of the CCPDS–CPP contract has been delayed pending resolution of user project approval." Further, the contracting officer told OAO:

The interchange discussions are not authorized as the subject contract has not been awarded. Furthermore, in accordance with AF DAR Sup 1–451, only the contracting officer has the authority to bind the Government. SAC personnel are not authorized to represent the Government in any negotiation for this acquisition. Therefore, any costs incurred as a result of the interchange meetings are not billable to the Government.

Plaintiff, at this point, halted all work begun following the November 18 agreement.

Following the March 6 meeting, SAC performed a reevaluation of the workload demands on the CCPDS. On March 30, 1984, the analysis was complete. The analysis showed: "[T]he processing workload, with all known system enhancements thru 1989, did not exceed 65 percent of the [CCPDS] processing capability." [27] Another meeting of SAC headquarters personnel convened on April 4, 1984. As a result of that meeting, General Charles May, the director of the command control directorate, cancelled the program. In a cable dated April 19, 1984, General May explained:

Our original requirement for the CPP, as briefed to the CCPDS System Management Group in May 1981, was based on the conclusions of the end-to-end test which indicated the systems capabilities would be exceeded in 1984—This statement is no longer true.... [T]he present system can indeed perform the operational functions required of it.

---

**24.** In 1979, CCPDS generated some highly publicized false attack signals. *See Failures of the North American Aerospace Defense Command's (NORAD) Attack Warning System,* 97th Cong., 1st Sess. (1981). This event spawned a Special Management Review in 1980. As a result of the Review, the Air Force established the System Integration Office to coordinate all CCPDS activities. SIO developed a manual of procedures in April 1982. These procedures were specifically applied to the FEP procurement on April 23, 1982. Nonetheless, SIO did not review the CPP procurement until January 1984.

**25.** Cyclic redundancy checks are reconfirmations of each incoming message for validity.

Often the same airplane generates multiple messages to CCPDS as radar and satellites each detect the object. The multiple sightings confirm the validity of the signal. One of the objects of the CPPs was to eliminate a cyclic redundancy check on each of these signals when they all confirm each other. Rather than rechecking each individual signal, the CPPs would allow the multiple sightings to verify the signal. SIO, however, determined that cyclic redundancy checks would still be necessary on each individual signal.

**26.** *See, e.g.,* Tr., Ex. P, Q, R.

**27.** *See, e.g.,* Tr., Ex. T.

On April 20, 1984, Lieutenant Tollinger informed plaintiff by telephone of the cancellation. On April 24, the Air Force wrote to OAO:

Therefore, the CCPDS can now handle the anticipated workload. After carefully considering the above, the Air Force determined that the CPP requirement no longer exists and the acquisition should be cancelled. We regret that the decision to cancel was made so late in the acquisition cycle, however, the information concerning the "future" programs was not known in November 1983. Once the information did become available, we had to accomplish an entire requirement analysis. This analysis led to the determination that the requirement for the CCPDS–CPP no longer exists.

On December 10, 1985, plaintiff submitted a claim to defendant for costs incurred under the CPP procurement, including bid and proposal costs. The contracting officer denied the claim on December 16, 1985. On April 10, 1986, plaintiff instituted an action in the Claims Court seeking $384,533.08 in damages. On March 28, 1988, another judge of the Claims Court denied defendant's motion for summary judgment. This court received the case on October 17, 1988. On March 20–22, 1989, the parties tried the case in Washington D.C.

Plaintiff contends that the Air Force's conduct manifested agreement to an implied-in-fact contract for the entire CPP procurement. In addition, plaintiff argues that the Government is equitably estopped from escaping liability for inducing contract performance by OAO. Moreover, plaintiff alleges that the Government took its property for a public use without just compensation—a compensable injury under the fifth amendment to the Constitution. Finally, plaintiff argues that defendant's arbitrary and capricious conduct entitles OAO to receive bid preparation costs.

Defendant counters that any agreement between the parties for procurement of CPPs was dependent upon additional approval steps, including execution of a written contract. These additional events never occurred. Defendant further contends that no individual with actual authority to bind the Government expressed an unequivocal acceptance of OAO's offer. With respect to the fifth amendment claim, defendant states that it did not take anything amounting to property within the meaning of the Constitution. Finally, defendant contends that plaintiff's proof of Government misconduct does not overcome the strong presumption that Government officials act in good faith.

Based on a record which both parties characterize as "fact intensive," this court must determine: (1) whether the conduct of the parties created an implied-in-fact contract; (2) whether the Government is estopped from denying liability; (3) whether the Government took from plaintiff any property within the meaning of the fifth amendment; and (4) whether Government officers acted arbitrarily or capriciously in administering the CPP procurement. Resolution of these issues necessarily includes determination of the actual authority of the contracting officer and the other defenses raised by defendant.

## DISCUSSION

### Implied-in-fact Contract

■ Plaintiff has the burden of proving that the parties entered an implied-in-fact contract:

It is plaintiff's burden to prove that an implied-in-fact contract was made. Extensive negotiations in which the parties demonstrate hope and intent to reach an agreement are not sufficient in themselves to establish a contract implied-in-fact.

*Pacific Gas & Elec. v. United States*, 3 Cl.Ct. 329, 339 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984). This burden requires plaintiff to show more than tentative acceptance of an offer after prolonged negotiations.

Rather plaintiff must show a "mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the Government in contract." *Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.

Cir.1984). In addition, plaintiff must show consideration for the alleged implied-in-fact contract. *Truckee–Carson Irr. Dist. v. United States*, 14 Cl.Ct. 361, 370 (1988). Thus, the requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs. *Russell Corp. v. United States*, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976); *see also Fincke v. United States*, 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982); *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 673–74, 428 F.2d 1241, 1255 (1970).

With regard to differences in the nature of evidence, the Supreme Court has stated:

A contract implied in fact is one inferred from the circumstances or acts of the parties; but an express contract speaks for itself and leaves no place for implications.

*Klebe v. United States*, 263 U.S. 188, 192, 44 S.Ct. 58, 59, 68 L.Ed. 244 (1923). Further, the Supreme Court has stated:

[A]n agreement "implied in fact," founded upon a meeting of minds, ... although not embodied in an express contract, is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.

*Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923).

▮ Although circumstantial, proof of an implied-in-fact contract must unambiguously show each of the elements of an express contract. *New Am. Shipbuilders, Inc. v. United States*, 15 Cl.Ct. 141, 143 (1988), *aff'd*, 871 F.2d 1077 (Fed.Cir.1989); *Sperry Corp. v. United States*, 13 Cl.Ct. 453, 458 (1987) (denial of cross-motions for summary judgment). Therefore, "acceptance of an offer [must] be manifested by conduct that indicates assent to the proposed bargain." *Pacific Gas*, 3 Cl.Ct. at 339. As a corollary to this rule, "in negotiations where the parties contemplate that their contractual relationship would arise by means of a written agreement, no contract can be implied." *Id.*

▮ In suits involving the Government, the requisite showing of an implied acceptance of an offer often raises questions about the actual authority of the Government's agent. The agents whose conduct allegedly binds the Government to an implied-in-fact contract must actually act within the bounds of their authority. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Alexandria v. United States*, 737 F.2d 1022, 1027 (Fed.Cir.1984). Recently the United States Court of Appeals for the Federal Circuit has reiterated that principle in another case involving the SBA's 8(a) program:

Oral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires; until then, there is no intent to be bound. Thus, it is irrelevant if the oral assurances emanate from the very official who will have authority at the proper time, to sign the contract or grant. *Empresas Electronicas Walser, Inc. v. United States*, 223 Ct.Cl. 686, 688 [650 F.2d 286] *cert. denied*, 449 U.S. 953 [101 S.Ct. 357, 66 L.Ed.2d 217] (1980). Where an approving official exceeds his authority, the government can disavow the official's words and is not bound by an implied contract. *Id.*

*New Am. Shipbuilders*, 871 F.2d at 1080 (Fed.Cir.1989). Therefore, anyone entering a contract with the Government assumes the risk of accurately ascertaining that the Government's agents act within their authority. *Federal Crop Ins.*, 332 U.S. at 384, 68 S.Ct. at 3. Evidence of an implied acceptance must include proof that the accepting officials clearly acted within the limits of their authority.

▮ With respect to the alleged $13.7 million implied-in-fact contract for CPP procurement, plaintiff does not prove a mutuality of intent to contract. Plaintiff also fails to establish the actual authority in the officer purported to have bound the Government. Therefore, plaintiff does not prove that the parties reached an implied-in-fact contract for the entire CPP project.

At the close of the November 1983 negotiations, both parties recognized that consummation of the contract was contingent upon future reviews and approvals. Indeed, execution of the written document was one of the events to occur before award of the $13.7 million contract. Other additional steps included further Air Force review, SBA acceptance, Department of Defense acceptance, funding approvals, and notification of Congress.

Moreover, the written contract corroborates the need for additional clearances before contract award. Plaintiff maintained that the written document contained the "complete and unambiguous terms of its negotiated contract." Pl. Brief filed June 22, 1987, at 14. Yet that document, under the heading "Approval of Contract," contained a provision requiring approval of the Secretary of Defense or his designee.[28] This clause in the General Provisions of the written document further underscores the additional clearances needed before final contract award.

Both Air Force and SBA procedures required additional clearances. The General Provisions of the proposed contract contain some of the Air Force's procedures, including the requirement of higher clearances. SBA similarly has procedures under its 8(a) program requiring formal approval. The parties knew or should have known of these required procedures at the time of the November negotiations. Thus, the parties knew, or should have known, that in the words of the Federal Circuit, "[o]ral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires." *New Am. Shipbuilders*, 871 F.2d at 1080.

Finally, at the end of the November negotiations, the parties understood that the Air Force would prepare and deliver to plaintiff a copy of the formal contract later.[29] The parties anticipated award of the $13.7 million contract upon execution of the writing. The parties contemplated that the CPP contract would arise upon completion of the written agreement. Execution of the writing did not occur. Neither did several of the additional clearances understood by the parties. Therefore, with respect to the $13.7 million CPP contract, no mutuality of intent to contract is evident.

Plaintiff also does not prove the actual authority of Captain Mather to bind the Air Force to a $13.7 million contract at the close of the November negotiations. Captain Mather's warrant was $250,000.00. Beyond that amount, Captain Mather's commitments required approval from higher authority. The incomplete contract sent to plaintiff in December contained a clause entitled "Approval of Contract." This clause required the Secretary of the Air Force (or a delegate of the Secretary) to approve the CPP contract. Captain Mather could not approve a $13.7 million contract without exceeding his authority limits. Plaintiff knew, or is responsible for knowing, of these limits on Captain Mather's authority.

In sum, the parties did not achieve an implied-in-fact contract for the entire $13.7 million CPP project in November 1983. The parties did not reach a meeting of the minds. Plaintiff knew, or should have known, that additional approvals were necessary and that contract acceptance required more steps. Without actual authority to close the deal, Captain Mather, even if he had intended to do so, could not have bound the Air Force.

■ Although the parties did not reach an implied-in-fact contract for the entire CPP procurement, they did reach an implied-in-fact contract for start-up costs. This court's predecessor "often allowed recovery on an implied-in-fact contract." *Narva Harris Constr. Corp. v. United States*, 216 Ct.Cl. 238, 244, 574 F.2d 508, 511 (1978); *see, e.g., Algonac Mfg.*, 192

---

**28.** Tr., Ex. 7, at 74–77. A page in the proposed contract document entitled "Implementation and/or changes in clauses" added the term "Secretary" to the "Approval of Contract" clause. Tr., Ex. 7, at 77. Thus, the clause requiring approval at the secretary's level was not buried in the body of the lengthy document, but was separately identified as an implementing change in the document's clauses.

**29.** *See, e.g.,* Pl. Compl. ¶ 16.

Ct.Cl. at 649, 428 F.2d at 1241; *Thomson v. United States*, 174 Ct.Cl. 780, 357 F.2d 683 (1966); *Penn–Ohio Steel Corp. v. United States*, 173 Ct.Cl. 1064, 354 F.2d 254 (1965). As mentioned earlier, plaintiff must, however, show each element of a contract, including meeting of the minds, consideration, and actual authority of the officers whose conduct allegedly binds the Government. Particularly where the Government induced contract performance with knowledge that the contractor expected compensation, this court's predecessor has imposed liability upon the Government. *See, e.g., Silverman v. United States*, 230 Ct.Cl. 701, 679 F.2d 865 (1982); *Cities Serv. Gas Co. v. United States*, 205 Ct.Cl. 16, 500 F.2d 448 (1974).

The circumstances of the bargaining and the parties' subsequent conduct show a mutuality of intent to enter a contract for start-up costs. The circumstances of this case are unique. In the first place, the contract directly and significantly affected national security. At all times, the healthy functioning of the nation's early warning system was a high priority for the Air Force. Practically any risk to the system demanded immediate and full attention. The Air Force's 1981 study had found that the system was in jeopardy. Accordingly, time was of the essence to correct the problem.

The failure of the first attempt to contract for relief to the system exacerbated the problem. Considerable time elapsed without any action to correct the potential flaws in the system. With the system approaching a period of heightened vulnerability, the Air Force demanded swift performance of the contract. For this reason, the Air Force welcomed the opportunity to procure relief from a sole source under the 8(a) program. The 8(a) program would cut short the time necessary to buy the new computers. The time demands of the project are also evident in the very brief time lapse, five days, between the April 20 exploratory meeting with plaintiff and notification that OAO would be the sole source contractor.

The dire need for the CPPs and the time pressures carried over into the November bargaining session. The Air Force made compliance with strict time limits one of its highest priorities in the negotiations. The implication was clear. Due to the national security demands, the CPPs would need to be on line as soon as possible after the contract date.

These time limits were one of the central elements of the bargaining. At first, the Air Force insisted upon receiving the CPPs within 60 days of the contract date with an LTD performed in advance. In any event, the Air Force suggested that it could not wait until June.[30] At length, after heated negotiations, the Air Force accepted a delivery time of 90 days after the contract date without an LTD.

At this point in the negotiations, Mr. Danko clarified that OAO could only meet the deadline by starting performance immediately. This explanation was hardly necessary because the parties understood the time constraints. Data General required 90 days from the point it received a firm order to deliver the machines.[31] The parties understood Data General's timing requirements. OAO needed another 30 days to program, test, prepare, and deliver the computers. At a minimum, plaintiff would need 120 days to perform the services demanded by the contract. Yet the contract specified delivery within 90 days of the contract date. By its terms, the proposed contract envisioned that plaintiff would commit itself and perform work 30 days in advance of the contract entry date. Mr. Danko's statement during the bargaining

---

30. *See, e.g.,* Tr. at 595 (Mr. Danko testifies Air Force "can't wait till June"); *see also, id.,* at 561–62.

31. Ms. Schelin, described as the technical expert for plaintiff who was in contact with Data General, testified that the lead time for the computer manufacturing process was 90 days. Tr., at 199–200. Mr. Danko testified that the lead time was 120 days, but acknowledged that Ms. Schelin knew some timing better. *Id.* at 592–93. If the lead time was in fact 120 days, this fact would have required plaintiff to begin work even earlier to meet the deadlines.

session was hardly necessary in light of the demands understood by all the parties.

Therefore, the Air Force officers expressed no surprise when Ms. Schelin arose as soon as the parties agreed to the deal and confirmed the Data General order. Lieutenant Tollinger acknowledged during testimony:

> [Mr. Smith]: I was going to paraphrase, but I can quote. This is from Page 56 of the deposition.
>
> "Question: While parties were still standing in the room, do you recall Ms. Schelin, I believe she's married now and is Ms. Logan, making a telephone call or announcing that she was going to make a telephone call to Data General? Answer: Yes.
>
> Question: What was she announcing? Answer: That she wanted to reserve their position on the assembly line for the Data General computer."
>
> [Lieutenant Tollinger]: And I don't dispute that.

Tr., at 394–95. Ms. Schelin's phone call was no surprise because Mr. Danko had offered to deliver within 90 days of contract date conditioned upon the understanding that OAO would begin performance immediately. The phone call bound OAO to accept the Data General machines or pay a cancellation fee. The Air Force fully expected OAO to begin work immediately. Ms. Schelin's binding phone call was part of the bargain. When Ms. Schelin made her call, no Air Force official counselled against pre-contract performance because the Air Force had bargained for pre-

cisely that. Moreover plaintiff's activities throughout the bargaining session made clear that Data General would need a commitment to begin manufacturing. The Air Force had induced plaintiff to begin work in advance of the contract date.

The Air Force had bargained to get performance in advance of contract award; plaintiff had agreed. Moreover that performance began in the presence of the Air Force when Ms. Schelin placed a telephone call to Data General.

In the wake of the November bargaining session, the parties continued to act in harmony with their agreement that plaintiff would start contract work promptly. At the close of the November meetings, the parties agreed to convene for a site preparation exchange. The contracting officer authorized this meeting on November 18, 1983. In anticipation of this meeting, the parties exchanged correspondence. Indeed meetings took place on January 5 and February 23–24 between plaintiff and SAC officials. At these meetings, the parties discussed site preparation and exchanged technical data.

In sum, the circumstances and conduct of the parties show a mutuality of intent for an implied contract for start-up costs. The Air Force had every incentive to, and indeed did, induce preaward performance by plaintiff. The early warning system showed signs of overload. The November 18 bargain permitted the Air Force to get a back-up system on line within 90 days. On this basis, Captain Mather entered the implied-in-fact contract for start-up costs.[32]

---

32. In oral argument, defendant contended that additional approval steps according to the DAR regulations and oral cautions about added approval steps by Lieutenant Tollinger defeated an implied-in-fact contract for the $13 million project. Setting the contract for the entire $13.7 million aside, however, defendant conceded that Captain Mather, without doubt, made "some sort of acceptance":

> The Court: Captain Mather is the contracting officer, and he shakes hands and otherwise indicates his acceptance of the deal, which he had authorized Lt. Tollinger to cut. What significance does that have?
>
> Mr. Barber [defendant's counsel]: In the absence of any additional elements and including the DAR provision or the oral state-

ments given by Captain Tollinger, then *that, in and of itself, could bind the Government to an agreement.* Major Mather was aware. He knew that—he was apparently apprised of the different conditions. So, *I don't think there's any doubt that there may have been some sort of acceptance on his part.*

> The Court: This even seems to be a deal that was pretty advantageous to the Government, doesn't it?
>
> Mr. Barber: In terms of?
>
> The Court: At the time [on] November 19th.
>
> Mr. Barber: Oh, sure, and that's where I'm going to get into the bid and proposal costs....

Tr., at 653–54 (emphasis added).

Because of the need to remedy the potential vulnerability of the early warning system, Captain Mather accepted the risk that the $13.7 million contract might not survive reviews. He concluded that the circumstances required an agreement to authorize immediate start-up work. Thus, at the conclusion of the negotiations, the parties shook hands and agreed to an implied-in-fact contract for start-up costs. The parties' conduct showed a meeting of the minds.

From this implied-in-fact contract, the Air Force would acquire desperately needed computers more swiftly than otherwise would be possible. A potential threat to national security would be reduced. From this implied-in-fact contract, plaintiff received the opportunity to begin working and earning compensation before final contract approval. The mutual promises in the implied deal for start-up costs were amply supported by consideration. Thus, plaintiff proved the elements necessary for an implied-in-fact contract for start-up costs.

No matter how worthy or commendable his far-sighted initiative, Captain Mather could not exceed the limits of his authority. As a contracting officer for AFCAC, however, Captain Mather had authority to enter agreements up to $250,000.[33] Although he lacked authority to bind the Air Force to the entire $13.7 million contract, Captain Mather could enter agreements up to $250,-000. Under the extreme circumstances of this case and fully expecting consummation of the entire contract within a month, Captain Mather exercised that option. Thus, the officer upon whom plaintiff relied for its implied start-up costs contract had authority to bind the Government up to $250,-000. *Orchards v. United States,* 4 Cl.Ct. 601, 607 (Fed.Cir.1984), *aff'd,* 749 F.2d at 1575.

*Termination of Implied-in-fact Contract*

■ On December 19, 1983, Captain Mather sent plaintiff a letter wholly inconsistent with the implied contract for start-up costs. Moreover, Lieutenant Tollinger, when asked to provide this letter, explained that the Air Force did not feel bound at that time. The relevant portions of the letter state that approval of the $13.7 million contract is still pending:

> Currently, the contract is going through legal and committee reviews. We anticipate contract award in mid-January 1984 pending availability of funds and required review and manual approvals.

The next sentence, however, should have put plaintiff on notice that the Air Force had reconsidered the start-up costs agreement: "This memo is provided as a 'status' report only and does not commit the Government to a contract award." The December 19 letter then advises plaintiff to call the contracting officer or Lieutenant Tollinger if it has any questions.

This letter and Lieutenant Tollinger's oral assertions that the Air Force was not bound imposed a duty on plaintiff to inquire whether the Air Force expected the start-up to continue as agreed. The Air Force had stated that it did not yet have a contract. The Air Force did not allude in the slightest to an agreement about an early start-up. Although invited to raise any questions, plaintiff did not inquire. In the absence of due diligence by plaintiff to ascertain the limits of its unwritten agreement, the implied-in-fact contract cannot be viewed as extending beyond December 19.

Plaintiff explains that it requested the December 19 letter to reassure Data General that the project was underway. These circumstances stress plaintiff's duty to recognize this communication as inconsistent with its start-up cost agreement. In merely providing reassurance to Data General, the contracting officer could have easily alluded to the start-up agreement. He did not do so. Plaintiff should have recognized the inconsistency and inquired further.[34]

Regardless of the circumstances that generated the letter, the December 19 document was an accurate indication of the

---

33. *See, e.g.,* Tr., at 267.

34. In oral argument, plaintiff admitted that it "should have said something there." Tr., at 626–27.

Air Force's view of its obligations. The letter showed that the Air Force's view of the project had changed. At a minimum, plaintiff should have asked why Captain Mather did not mention their start-up agreement. Plaintiff was an experienced government contractor. Plaintiff should have recognized that the December 19 document was inconsistent with a continuing start-up contract. Lieutenant Tollinger's verbal statements at the time should have further aroused plaintiff to inquire about the Air Force's current view of the start-up agreement.

If plaintiff had made that inquiry, it would have learned on December 19 that the Air Force would not honor its start-up agreement. Plaintiff could have mitigated its damages beginning December 19. By declining to ascertain the limits of the start-up agreement, when circumstances reasonably required inquiry, plaintiff became responsible for any work after December 19. This court cannot acknowledge the start-up costs agreement as continuing past December 19.

### Equitable Estoppel

■ Plaintiff contends that the Air Force is estopped from denying that OAO performed contractual work. The Claims Court has established, however, that equitable estoppel cannot "fill the gap resulting from an absence of authority to contract." *Llamera v. United States*, 15 Cl.Ct. 593, 600 (1988); *see also Hazeltine Corp. v. United States*, 10 Cl.Ct. 417, 440 (1986), *aff'd* 820 F.2d 1190 (Fed.Cir.1987). Even in equitable estoppel cases, plaintiff must prove the actual contracting authority of the official upon whose acts it relied. *Id.*

Plaintiff has not shown that Captain Mather or Lieutenant Tollinger possessed actual authority to bind the Air Force to the $13.7 million contract. Therefore, equitable estoppel will not bar defendant from successfully denying the existence of a contract for the entire CPP project.

■ As an alternative to the implied-in-fact contract for start-up costs, plaintiff satisfies the elements of equitable estoppel

for start-up expenses. The Federal Circuit set forth those elements:

(1) the party to be estopped [the Government] must know the facts;

(2) the Government must intend that the conduct alleged to have induced continued performance will be acted on, or the contractor must have the right to believe the conduct in question was intended to induce continued performance;

(3) the contractor must not be aware of the true facts; ... and

(4) the contractor must rely on the Government's conduct to its detriment.

*American Elec. Laboratories v. United States*, 774 F.2d 1110, 1113 (Fed.Cir.1985).

With regard to the first element of the equitable estoppel test, the Air Force knew that it had bound plaintiff to perform pre-award work for which OAO might not get paid. Plaintiff had no knowledge that the Air Force would not honor their mutual start-up agreement. Plaintiff, after all, had ordered the equipment in the Air Force's presence. Plaintiff's lack of knowledge satisfies the third element of the test. Plaintiff clearly relied on the Air Force's conduct by ordering the computers and beginning performance in advance of contract award. Plaintiff's reliance satisfies the fourth element.

Thus, the crux of this alternative equitable estoppel case is the second element. This case satisfies both parts of the second element. In the first place, the Air Force induced plaintiff to begin work ahead of the final award of the $13.7 million contract. The Air Force intended plaintiff to begin work immediately. The Air Force bargained to induce plaintiff to do at least 30 days of work in advance of final award. Then the contracting officer and the contract manager watched OAO begin performance when Ms. Schelin ordered the computers. Moreover, the parties on November 18 arranged site preparation meetings.

In the second place, plaintiff reasonably believed that its agreement with the Air Force required immediate performance. Plaintiff reasonably interpreted the con-

duct of the Air Force as binding both parties to an advance start-up agreement. The Air Force is equitably estopped to deny liability for the start-up costs agreement.

### Taking Claim

■ Plaintiff also seeks compensation because its "private property [was] taken for public use, without just compensation" —an alleged violation of the fifth amendment to the Constitution. Plaintiff contends that its contract work was property within the meaning of the fifth amendment. Plaintiff also argues that the Air Force "took" some interface control manuals provided by OAO at the technical exchange meetings. When the Air Force cancelled the contract, plaintiff argues that the Government destroyed the value of this "property." [35]

Plaintiff's fifth amendment claim fails. Plaintiff's interest in the complete $13.7 million contract is not property within the meaning of the fifth amendment.[36] *Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 239–40 (1983), *aff'd mem.*, 765 F.2d 159 (Fed.Cir.1985).

The Supreme Court has not categorically defined property. *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 514, 15 L.Ed.2d 428 (1966). Every economic interest or expectancy is not necessarily property within the meaning of the fifth amendment. Rather, only those rights which "have the law back of them" merit protection by the Constitution. *Kaiser Aetna v. United States*, 444 U.S. 164, 178, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979) (quoting *United States v. Willow River Power Co.*, 324 U.S. 499, 502, 65 S.Ct. 761, 763, 89 L.Ed. 1101 (1945)).

Plaintiff's interest in work performed in anticipation of a $13.7 million contract does not "have the law in back of it." This court's predecessor explained: "It is settled law that no assurance exists that a contractor will receive an award and that the Government retains, in its discretion, the right to reject all bids without liability, even after there have been extensive negotiations with a bidder." *American Gen. Leasing Inc. & Infodyne Systems Corp. v. United States*, 218 Ct.Cl. 367, 374, 587 F.2d 54, 58–59 (1978). As discussed extensively earlier, the Air Force refused to enter the $13.7 million contract. No express or implied-in-fact contract for the entire CPP project ever existed. Therefore, plaintiff had no legal right to receive pay for that entire contract. Plaintiff's expectation of a contract and its efforts before that award do not constitute fifth amendment property.

With respect to the interface control manuals, plaintiff admits that these materials only had value as part of the expected contract. In the words of plaintiff's counsel, "not a lot of value to an interface control document that defines the interface between the Data General and the Univac, if you don't have the Data General to plug into it." Tr., at 639. The manuals, therefore, were part of the work performed in anticipation of the contract. Plaintiff had no legally enforceable rights to receive pay for work in pursuit of the expected contract. The fifth amendment does not apply to the manuals or other work performed in anticipation of the $13.7 million contract award.

### Proposal Preparation Costs

■ Plaintiff seeks award of bid preparation costs. Plaintiff argues that the Air Force was arbitrary and capricious in soli-

---

**35.** In oral argument, counsel for plaintiff stated its fifth amendment claim:

Mr. Smith: The taking occurs because the company has developed something that has a property value. The Air Force cancels the program. As Captain Bateman indicated, not a lot of value to an interface control document that defines the interface between the Data General and the Univac, if you don't have the Data General to plug into it. That's the taking.

Tr., at 639–40.

**36.** To the extent that plaintiff argues that its interest in a contract for start-up costs was "taken," such a contention is coterminous with the implied-in-fact contract claim. Therefore, this court need not address whether plaintiff has a property interest in the start-up work covered by the implied-in-fact contract.

citing OAO's bid when it allegedly knew or should have known that the CPP was not necessary.[37] Plaintiff does not, however, supply evidence which satisfies the high legal standard for recovery of bid proposal costs.

The Court of Claims ruled that a contractor may recover bid expenses when the Government breaches its implied duty to honestly consider proposals. *Heyer Prod. Co., Inc. v. United States,* 135 Ct.Cl. 63, 71, 140 F.Supp. 409, 413 (1956). This court's predecessor articulated the standard for recovery of bid expenses in *Keco Indus. Inc. v. United States:*

> The ultimate standard is, as we said in *Keco Industries I, supra* [192 Ct.Cl. 773, 428 F.2d 1233 (1970)], whether the Government's conduct was arbitrary and capricious toward the bidder-claimant.

203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974). The Court of Claims then set forth the criteria that control a finding of arbitrary and capricious conduct:

> 1. subjective bad faith on the part of the procuring officials;
> 2. proof that there was 'no reasonable basis' for the administrative decision;
> 3. the degree of proof of error necessary for recovery is ordinarily related to the amount of discretion entrusted to the procurement officials;
> 4. proven violation of pertinent statutes or regulations.

*Keco II,* 203 Ct.Cl. at 574, 492 F.2d at 1203–04.

In a case where the Government cancels the solicitation altogether, the Claims Court sets an even higher standard: "[O]nly a bad faith rejection of all bids or cancellation of the solicitation may give rise to a right to recover bid preparation costs." *Contract Custom Draperies Serv. v. United States,* 6 Cl.Ct. 811, 818 (1984). The Claims Court bases this high standard on the strong presumption that Govern-

ment officials act properly, *see, e.g., Eagle Constr. Corp. v. United States,* 4 Cl.Ct. 470, 479 (1984), and on the Government's right to reject uniformly all bids without liability, *see, e.g., American Gen. Leasing,* 218 Ct.Cl. at 374, 587 F.2d at 59. To show bad faith, plaintiff must present "well-nigh irrefragable proof." *Id.*

Plaintiff concedes that the Air Force did not act in bad faith:

> Mr. Smith: We are not alleging or I'm not going to stand up here and try and argue bad faith because I know what the burden is, and I don't think the proof that we've heard today supports bad faith.

Tr., at 646. The proof indeed does not support a finding of bad faith. In fact, the proof does not show that the Air Force failed honestly to consider the OAO bid in any way.

Lieutenant Colonel Schaebethal testified extensively about the circumstances which caused the cancellation of the procurement. He documented the changes between the 1981 study justifying the CPP project and the 1984 study cancelling it. SIO ruled that cyclic redundancy checks could not be removed by the CPPs. Tr., at 496–97. Nonetheless, the primary reason for the decision to terminate the CPP project was a reduction in the projected number of messages into the CCPDS. *Id.,* at 501, 507, 512. Lieutenant Colonel Schaebethal also testified about the detailed consideration given to this project by SAC, AFCAC, and even the Joint Chiefs of Staff. Plaintiff's counsel correctly assessed that the proof did not support a finding of bad faith.

Nor was any bad faith or arbitrary and capricious conduct evident in the Air Force's failure to conduct the 1984 study before initiating the CPP solicitation. With national security at stake, the Air Force had clear justification for pursuing a CPP

---

**37.** In oral argument, plaintiff made its argument clear:

> [Mr. Smith]: ... So, you have the first version of the study in 1981 kicking off the FEP procurement. You have Version 2 of the same study three years later resulting in the cancellation of the CPP procurement. There's

absolutely no reason they should not have done exactly the same thing in the middle before they started CPP, instead of putting the company through the time and expense of a proposal.

Tr., at 643.

contract at the same time it reviewed the integrity of its early warning system. This urgent and unique circumstance gave rise to the implied-in-fact contract, but not to any form of bad faith. Accordingly, plaintiff does not establish entitlement to bid preparation costs.

### Damages

 On the basis of an implied-in-fact contract for start-up costs, defendant must compensate plaintiff for work performed between the entry of the agreement on November 18 and December 19, 1983. This work includes the ordering of computer hardware from Data General, which occurred immediately after the agreement when Ms. Schelin arose in the presence of Air Force contracting personnel to confirm the order. In any event, plaintiff may not recover more than $250,000, the extent of Captain Mather's contracting authority.

Plaintiff has shown the cost of ordering (and subsequently cancelling) hardware from Data General was about $78,000.00. For the reasons stated, this amount is part of plaintiff's damages. In addition to this portion of the start-up costs, defendant owes plaintiff for any other work pursuant to the start-up agreement performed between November 18 and December 19. Mr. Danko testified that this amount could be easily determined from plaintiff's books.[38] In light of the availability of those figures, this court directs the parties to consult their records to ascertain that amount.

### CONCLUSION

Although the parties did not reach an express or implied contract for the entire $13.7 million CPP project, the parties did achieve an implied-in-fact contract for start-up costs. This implied-in-fact agreement, however, ended on December 19, 1983, when plaintiff did not inquire into Air Force conduct and communications inconsistent with the start-up contract. Plaintiff did not establish a violation of the fifth amendment to the Constitution or entitlement to proposal preparation expenses.

Plaintiff is entitled to an award based on an implied-in-fact contract for start-up costs covering work performed from November 18, 1983, to December 19, 1983, including the Data General cancellation fee. Accompanying this decision, this court has issued an order requiring the parties to ascertain and report the dollar amount of the work performed or other expenses incurred, during this period, so that judgment may enter.

IT IS SO ORDERED.

---

38. [Mr. Barber, defendant's counsel]: Could you tell me how much of the preaward costs were expended after December 19?
  [Mr. Danko]: No, I couldn't.
  [Mr. Barber]: Do you have an estimate of the percentage?
  [Mr. Danko]: I really couldn't, *I mean its clearly something that would be easy to determine from our books.* But I could not tell you that.
  [Mr. Barber]: So, you are not able to establish what costs were expended after December 19?
  [Mr. Danko]: I am able to establish it. I don't know it right now.
  Tr., at 125 (emphasis added).