**OCR, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 10–86 C.

United States Court of Federal Claims.

Aug. 23, 1994.

Glenn H. Carlson, Washington, DC, for plaintiff.

Shalom Brilliant, with whom were Asst. Atty. Gen. Frank W. Hunger and David M. Cohen, Washington, DC, for defendant.

OPINION and ORDER

TURNER, Judge.

This opinion addresses plaintiff's motion for partial summary judgment filed on May

18, 1993, and defendant's cross-motion for summary judgment filed on July 27, 1993. We conclude that plaintiff's motion should be denied and that defendant's cross-motion should be (1) granted as to count I of the complaint but (2) denied as to count II of the complaint.

## I

OCR, Inc., by complaint filed January 6, 1986, seeks relief for alleged breach by the Department of Justice (DOJ) of two separate service contracts, one an express, written contract for the keying of some information as well as the optical scanning of certain documents into a computerized data base (Contract No. 4C–M–CIV–0014) and the other an implied-in-fact contract for the optical scanning of document contents into a computerized data base (allegedly formed after the expiration of Contract No. 2C00007, an express, written contract for optical scanning).

In count I of the complaint, plaintiff challenges the contracting officer's (CO's) decision terminating the keying/scanning contract for default. Plaintiff claims that the termination was for the convenience of DOJ and seeks $819,598 in damages. In count II, plaintiff seeks $14,197 which it claims is due for certain invoiced work and for related expenses pertaining to the implied-in-fact optical scanning contract.

Plaintiff has moved for partial summary judgment on the issue of liability of defendant for damages arising from the default termination of the keying/scanning contract challenged in count I. Defendant has moved for summary judgment on both counts I and II.[1] We address each count in turn.

## II

### A

In 1983, DOJ solicited bids from data processing service contractors in connection with a broad, multi-task, litigation support services arrangement. In general, litigation support services entailed the organization and indexing of documents involved in DOJ's numerous pending civil cases. Plaintiff was the successful bidder for Task D—Data Reduction—of DOJ's solicitation.[2] CACI Federal, Inc., the contractor selected for Task C—Document Processing—was responsible for, among other things, the recording of document titles or subjects and other bibliographical information pertaining to documents, on document coding forms (DCFs).

Task D required plaintiff to key information from CACI coded DCFs onto magnetic tapes (keying), to convert trial transcripts, depositions and other documents into machine readable media (scanning) and to provide general data conversion or keying services. Def.Br., Appendix at 65–68. Plaintiff subcontracted with MIH, Inc. to perform all the keying work while plaintiff performed all the scanning work.

Plaintiff's keying responsibilities under the Task D contract were triggered by DOJ's issuance of requests for services generally referred to in this litigation as "delivery orders." Def.Br., Appendix at 90, 91. Delivery orders included the case name, an estimate of the total amount of DCFs and characters to be keyed, an estimate of the number of DCFs that would be delivered each week and the expected throughput rate per week.[3] Pl.Br., Appendix at 49–144. Coded DCFs (prepared by CACI, the Task C contractor) were to be delivered to plaintiff within ten days after issuance of each delivery order. Def.Br., Appendix at 95. Defendant issued the first delivery orders in December 1983. Pl.Br., Appendix at 49. Plaintiff, however, did not receive any DCFs until the third week of March 1984. Pl.Br. at 51, 52.

---

1. Plaintiff did not file a response to defendant's cross-motion or a Statement of Genuine Issues pursuant to RCFC 56(d)(2).

2. The solicitation, as amended, contained a statement of work describing eight separate litigation support tasks to be performed for DOJ's Civil Division including microfilming, "blowback"/copying, document processing, data reduction, design and maintenance of litigation support data bases, design and maintenance of special purpose data bases, establishment and maintenance of document centers, and trial/deposition support. Def.Br., Appendix at 48, Section E—Statement of Work.

3. "Throughput rate per week" means the number of characters to be keyed per week.

## B

Under the terms of the keying contract, plaintiff was ordinarily to deliver completed magnetic tapes within two weeks after its receipt of DCFs to be keyed based on a throughput rate not to exceed five million keyed characters per week. Under an accelerated turnaround schedule, magnetic tapes were to be delivered within one week of receipt of DCFs to be keyed based on a throughput not to exceed two million keyed characters. Def.Br., Appendix at 70, 92. The throughput rate for the regular turnaround schedule was increased from five million to eight million keyed characters per week by bilateral Modification No. 0001, executed March 26, 1984. There was no change to the accelerated turnaround schedule. Def. Br., Appendix at 115.

Plaintiff was unable to meet the throughput rates and turnaround times specified in the contract. In addition, plaintiff had problems satisfying the accuracy requirements of the contract. On July 17, 1984, Contracting Officer Michael Dumond issued a cure notice to plaintiff. Def.Br., Appendix at 23–24. This notice referenced DOJ's concern over MIH's expressed inability to meet the eight million character keying capacity in spite of plaintiff's agreement to perform at this level. Dumond required plaintiff to ensure that it would be able to meet the eight million characters per week requirement. By letter dated August 10, 1984, plaintiff assured Dumond that it would meet required production by employing additional subcontractors. *Id.* at 25.

Clarisse Abramidis, Case Manager of the Civil Division, by letter of September 20, 1984, notified plaintiff that a large number of errors had been found in the DCF keying work delivered by plaintiff for three specific cases. Def.Br., Appendix at 26. Soon thereafter, Eric Donovan, Case Manager for asbestos litigation, by letter of September 28, 1984, informed plaintiff of the rejection of OCR's first batch of keying for the asbestos cases because of keying errors. *Id.* at 41.

Sometime in October 1984, plaintiff dismissed MIH as its subcontractor and replaced it with C & M Systems Corporation (C & M). *Id.* at 146–47, Deposition of Jon P. North, President of OCR; Def.Br., Appendix at 4.

Plaintiff continued to have problems meeting the turnaround times and accuracy requirements of the contract. At a December 7, 1984 meeting, plaintiff was informed that of 22,676 DCFs sent to plaintiff for keying over the period from October 31, 1984 through November 30, 1984, plaintiff had keyed and delivered tapes for only 473 and that all of those tapes were returned for correction of formatting errors. Def.Br., Appendix at 5, Declaration of Abramidis. Shortly after this meeting, plaintiff provided a "Delivery Schedule" which established dates for the delivery of specific keying work, with the completion of all work received to that date by December 20, 1984. Def.Br., Appendix at 32. Plaintiff failed to meet its own deadlines.

## C

On January 7, 1985, plaintiff was notified by telegram that the contract was terminated for default because of plaintiff's "failure to deliver keyed material within the delivery time specified in the contract and within the accuracy levels specified in the contract." Def.Br., Appendix at 35. The CO issued a final default termination decision on January 22, 1985. *Id.* at 36–37.

## III

## A

Plaintiff, in its motion for partial summary judgment with respect to count I of the complaint, asserts that DOJ breached Article XII of the keying contract by not delivering DCFs within ten days of the issuance of a delivery order.[4] Pl.Br. at 31. Next, plaintiff argues that DOJ breached the contract by failing to deliver keying specifications at the initial stages of plaintiff's performance and

4. Article XII—*Government Furnished Material* provides:
    A. The Government will, within ten (10) calendar days after award of Delivery Orders, make shipment, F.O.B. Destination, to the Contractor of all Government furnished material required for performance of said Delivery Order.
Def.Br., Appendix at 95.

that this failure to deliver constituted a non-disclosure of superior knowledge. *Id.* at 38–39. Furthermore, plaintiff asserts, DOJ breached the contract when it "did not provide test batches as it said it would, and it did not install any tracking system for any timeliness/delay determination." *Id.* at 39. Although not explicitly argued in its brief, plaintiff contends that Article XII required DOJ to provide keying specifications, formatting specifications and test batches as well as requiring DOJ to deliver coded DCFs within ten days. Pl.Br. at 52–53, Affidavit of David S. Smyth, President of MIH. Plaintiff does not point to any other provision of the contract for support nor does it explain how Article XII imposes such requirements on DOJ. Plaintiff also maintains that under a proper construction of the contract, it never made an untimely delivery of magnetic tapes and thus the termination for default was improper. *Id.* at 33–35.

■ Defendant disagrees, arguing first that we lack jurisdiction to entertain plaintiff's claim for damages based upon the alleged breach of Article XII. Def.Br. at 18. Defendant argues that plaintiff's claim that DOJ breached Article XII of the contract by failing to ship DCFs within ten days of issuing a delivery order was not submitted to the CO, a jurisdictional prerequisite to our consideration of any contract claim. Furthermore, says defendant, although some of the arguments presented to the CO may be related to the arguments asserted in connection with the newly-alleged breach of Article XII, the theories and factual issues of this claim and the claims which were asserted before the CO are quite dissimilar. *Id.* at 20.

We disagree with defendant's position on jurisdiction. Although plaintiff did not specifically refer to Article XII in its claim before the CO, it nevertheless alleged that "[a]t no time did the government deliver on the date scheduled for delivery and oftentimes work was not delivered to MIH until after the expiration date of the purchase order." Def.Br., Appendix at 170. Plaintiff's instant claim thus does not raise new matters. In fact, the CO's response to plaintiff's claim of government-caused delay implicitly acknowledged that delivery dates were missed. The

CO stated, "OCR's complaint that delivery dates were missed was remedied by the Government allowing additional time because of any delay." Def.Br., Appendix at 205, CO's final decision dated July 31, 1987. We conclude that we have jurisdiction to address the merits of plaintiff's motion.

On the merits, defendant maintains that it is not liable to plaintiff for damages in connection with the termination of the keying contract and that the alleged DOJ breach had no impact upon plaintiff's performance of the contract and constitutes neither a basis for damages nor a justification for plaintiff's default. Defendant asserts that neither the alleged breach of Article XII nor any of the other arguments raised by plaintiff demonstrates that the default termination was improper or that plaintiff is entitled to any compensation. Defendant contends that the termination for default was proper because plaintiff repeatedly failed to meet the turn-around times specified in the contract.

### B

Plaintiff's arguments in support of its motion for partial summary judgment are without merit. Even if DOJ breached the contract by failing to deliver DCFs within ten days after the issuance of the applicable delivery order, the delay had no effect upon plaintiff's ability to perform its task within the time specified by the contract. This is because the two-week turnaround time that plaintiff was required to meet ran from the date of plaintiff's actual receipt of the DCFs, not from the date of issuance of a delivery order. Thus, the amount of performance time available to plaintiff was unaffected by any late delivery of DCFs.

Plaintiff fails to explain how any delay affected its performance. Instead, it argues that it was never late delivering magnetic tapes because the contract did not require delivery until two weeks after plaintiff receives the "last batch" of coded DCF's. Plaintiff points to Section D. 2: *Data Conversion of Coded DCFs* of the contract which provides:

Magnetic tapes delivered as created starting two weeks following delivery of coded DCFs and completed two weeks after re-

ceipt of last batch of coded DCFs. The throughput rate shall not exceed 5 million keyed characters per week. Accelerated schedule—Throughput rate is changed to 2 million characters delivered one week following delivery of coded DCFs.

Def.Br., Appendix at 70. Plaintiff argues that under this provision the keying work did *not* have to be completed until two weeks following the receipt of the "last batch" of a case's coded DCFs. During the entire period that OCR/MIH participated in the contract, plaintiff claims that no batch of DCFs was ever labeled or identified by DOJ as a "last batch" for any case and, therefore, without plaintiff being placed on notice that a "last batch" of a case was in its hands, no keying work product could ever have been deemed late. Pl.Br. at 34. "The 'last batch' concept was the key to tardiness determinations. It was *only* upon receipt of the last batch that a completion date was established." Pl.Br. at 34–35.

▮ In resolving questions of contract interpretation we look to the plain language of the contract. *Gould, Inc. v. United States,* 935 F.2d 1271 (Fed.Cir.1991). Section D. 2. unambiguously requires that plaintiff deliver completed magnetic tapes *starting* two weeks after receipt of the first batch of DCFs. This is not a foreign interpretation to plaintiff. Plaintiff's "Production Control" flow chart, submitted in response to a pre-award request for clarification, is based on the contract turnaround times measured from the date of receipt of the DCFs. Def.Br., Appendix at 110.

Plaintiff claims that the contract required DOJ to deliver to plaintiff keying specifications at the initial stage of plaintiff's performance and that "OCR/MIH never received such specifications for the keying it performed on the contract." Pl.Br. at 38, 53. However, plaintiff's complaint alleges that DOJ did provide a keying manual six to eight months into the contract performance period. Complaint at ¶ 21. Moreover, defendant maintains that DOJ provided plaintiff with oral keying instructions at about the time the first batches of DCFs were delivered and that the nonperformance that led to the default termination was not the result of any lack of keying instructions; rather, the primary reason for the default termination was the untimeliness of OCR's delivery of tapes. Def.Br. at 16–17.

It is uncontroverted that plaintiff's keying errors were not of a type that depended on keying instructions. Plaintiff's errors included keying different data from that contained on the DCFs, omitting entire fields of information, delivering unreadable tapes, duplicating DCFs repeatedly on one tape, and delivering tapes containing data concerning cases unrelated to the cases which were the subject of those tapes. Def.Br., Appendix at 7, 41. Nor was the accuracy of CACI's work a factor in defendant's evaluation of plaintiff's performance: if the information keyed from a DCF was incorrect, DOJ attributed that error to CACI. Def.Br., Appendix at 8, 65.

Plaintiff's contention that the contract contemplated "delivery of small volumes of material at first which would later pick up into a steady stream of up to five and later eight million characters per week," is likewise without merit. Complaint at ¶¶ 20, 25(a) & 44. In addition to not pointing to any provision of the contract which states this, plaintiff's pre-award response to the technical review committee's request for clarification on plaintiff's ability to meet workloads given uneven workflows reveals that plaintiff was aware of the likelihood of an uneven workflow. Plaintiff's response states:

[Plaintiff] is *not* concerned about his ability to meet the maximum volumes, nor desires or expects the work to be evenly distributed throughout the year. In fact, most of the workload from any one of our customers is sporadic at best, resulting in continuous peaks and valleys. Peaks and valleys are a way of life in the service bureau business.

... Our proposal was intended to reflect our flexibility to meet unusual demand and we have the necessary resources (staff, equipment, subcontractors, additional shifts, etc.) to meet the terms of the project.

Def.Br., Appendix at 121 (emphasis in original). The contract did not contemplate a steady workflow, nor did plaintiff expect one.

Plaintiff, in fact, acknowledges that the performance standards of the contract were not satisfied. However, plaintiff attempts to shift responsibility from itself to DOJ by alleging that DOJ was responsible for dismissing MIH and for selecting C & M as a substitute subcontractor. Complaint at ¶¶ 32–33. Plaintiff states:

> 41. ... The performance deficiencies at issue in OCR's termination in fact arose from the failure of the defendant's selected substitute subcontractor, C & M, to meet the performance standards of the contract....
>
> 42. As soon as plaintiff was made aware that the substitute subcontractor was not meeting the performance standards of the contract, plaintiff moved immediately to effect proper corrections. Ultimately, the government's substituted subcontractor was either incapable or unwilling to meet the contract specifications.

Complaint at ¶¶ 41, 42. These allegations are without merit because DOJ did not select C & M as a substitute contractor, plaintiff did. Jon P. North, OCR's President, stated in a deposition that OCR selected C & M based upon the recommendation of "an acquaintance." Def.Br., Appendix at 147. Although DOJ expressed its dissatisfaction with MIH's performance, DOJ never directed plaintiff to dismiss MIH. *Id.* at 130.

Also alleged in count I is that the "original" contract did not involve any keying work in connection with DOJ's asbestos litigation, but "[n]evertheless, in March 1984, plaintiff was given the asbestos case work." Complaint at ¶ 29. The contract did not expressly include or exclude asbestos cases nor did it otherwise include or exclude other cases. The contract required plaintiff, "to perform litigation support services [for DOJ] in connection with cases as defined in the Statement of Work...." Def.Br., Appendix at 90. Starting in September 1984, DOJ delivered—and plaintiff accepted without objection—asbestos case related keying work. Def.Br., Appendix at 39.

Defendant contends that plaintiff's claim that DOJ rejected keying work based on higher accuracy standards than called for in the contract is likewise without merit. Complaint at ¶ 28. The contract was ambiguous with respect to accuracy requirements.[5] However, it is uncontroverted that DOJ held plaintiff to the lower standard (98 percent accurate by character) and did not reject any of plaintiff's work based upon the higher standard (98 percent accurate by field). Pl. Br., Appendix at 219; Def.Br., Appendix at 9, 39.

### C

Plaintiff has failed to demonstrate entitlement to judgment as a matter of law on the issue of defendant's liability for breach of contract or on its preemptive assertion that the default termination was improper, even assuming the absence of a genuine factual dispute. Therefore, we deny plaintiff's motion for partial summary judgment.

Defendant, on the other hand, has discharged its burden of proving the absence of any genuine issue of material fact with respect to the default termination issue (on which it bears the burden of proof) and has demonstrated on the merits that the default termination was proper. Plaintiff clearly failed to meet the turnaround times and accuracy requirements of the contract. Because plaintiff has not furnished some credible evidence sufficient to require trial on the merits, we grant defendant's cross-motion for summary judgment as to count I.

### IV

### A

Defendant moves to dismiss count II for lack of jurisdiction, or, in the alternative, for failure to state a claim upon which relief can be granted. Def.Br. at 32. Defendant argues that plaintiff failed to submit to the CO a claim satisfying the requirements of the Contract Disputes Act, 41 U.S.C. § 605(a), a jurisdictional prerequisite, and that even if the court determines that plaintiff submitted

---

5. The contract was ambiguous as to whether the 98 percent accuracy requirements for data other than document number and date was to be applied by character or by data field (group of characters).

a proper claim, count II should alternatively be dismissed because it "is so vague and riddled with contradictions that it fails to articulate a coherent grievance, much less state a claim upon which relief can be granted." Def.Br. at 34. Furthermore, says defendant, if the complaint is construed as alleging an implied contract, the implied contract is invalid because no official involved had authority to bind the government. *Id.* at 36.

## B

Count II is inappropriately titled "Breach of Contract No. 2C0007." Contract 2C00007 was awarded to plaintiff on July 8, 1982, and was to expire on September 30, 1983. This contract required plaintiff to optically scan and convert various litigation documents to machine readable form. Complaint at ¶¶ 58, 62. The original term of the contract was extended to December 31, 1983, by Modification P0004. Plaintiff alleges, apparently inadvertently, that "[n]evertheless, the Justice Department continued to send work to plaintiff after the *September 30th* deadline and plaintiff continued to accept and do the work submitted." Complaint at ¶ 63 (emphasis added). We assume that plaintiff means it accepted work after the December 31, 1983 deadline. As a result, plaintiff claims that it entered into an implied contract with DOJ for continued optical scanning services. Complaint at ¶ 64.

Plaintiff next alleges the occurrence of significant modifications to the implied contract on or about August 30, 1984:

> 69. The material received by plaintiff after August 30, 1984, was not subject to the original contract No. 2C0007, because the material differed substantially in scope and in nature from the material addressed and covered by the initial contract.

> 70. The implied contract ... did not specify any time for delivery of the materials. The materials delivered from and after August 30, 1984, was so substantially different in scope and nature from that governed by the initial contract that defendant agreed to establish a separate and distinct pricing and delivery standards for this material. By doing so, defendant acknowl-

edged that the time for delivery criteria of the initial contract were inappropriate.

Complaint at ¶¶ 69, 70. Plaintiff alleges that this implied contract was entered into with the Litigation Support Staff (LSS) of DOJ.

## C

■ On May 24, 1985, plaintiff submitted a written claim to the CO, demanding "payment of $10,197 in satisfaction of the Government's obligations under the invoice[s]," plus "$5,000, reflecting the legal expenses and additional administrative expenses incurred by OCR in connection with the Government's breach of its contractual obligations in connection with OCR's performance of the work here at issue." Def.Br., Appendix at 149. The CO, in a final decision dated August 30, 1985, acknowledged the existence of a separate pricing structure but did not regard it as binding, because the government employees who agreed to the particular pricing structure did not have the necessary authority to bind the government in contract. Def.Br., Appendix at 216–18. Because count II of the complaint alleges breach of an implied contract between the parties and plaintiff's May 24, 1985 letter constitutes a claim within the meaning of the CDA (and was in fact acted upon as a claim), we have jurisdiction over count II. *See Total Medical Management, Inc. v. United States,* 29 Fed.Cl. 296, 299 (1993) ("Challenges to jurisdiction are overcome simply 'on the basis of well-pleaded allegations in the complaint.'") (quoting *Spruill v. Merit Systems Protection Board,* 978 F.2d 679, 686 (Fed.Cir.1992)); *accord Adam v. United States,* 26 Cl.Ct. 782, 785–86 (1992) (stating, without specific reference to contract claims, that jurisdiction exists when plaintiff makes a "colorable allegation"); 41 U.S.C. § 605(a).

## D

■ Although count II is inartfully drafted, plaintiff has alleged the breach of an implied-in-fact contract and thus states a claim upon which relief could be granted. To prove its allegations concerning an implied-in-fact contract, plaintiff ultimately will bear the burden at trial of showing mutuality of intent to contract, offer and acceptance, and

that the officer whose conduct is relied upon had actual authority to bind the government in contract. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *Pacific Gas & Electric Co. v. United States,* 3 Cl.Ct. 329, 339 (1983), *aff'd,* 738 F.2d 452 (Fed.Cir.1984).

■■■■ Further, defendant, as movant, has not discharged its burden of demonstrating the absence of any genuine issue of material fact with respect to count II. Defendant's reliance on the CO's unsworn, conclusory statement that the Justice Department employees who entered into a service agreement with plaintiff had no authority to bind the government, Def.Br., Appendix at 216, is not sufficient proof of lack of authority. Because there is an insufficient record on the issue of employee authority, we deny defendant's cross-motion for summary judgment as to count II.

### V

Based on the foregoing, plaintiff's motion for partial summary judgment is DENIED, and defendant's cross-motion for summary judgment is GRANTED as to count I of the complaint. Defendant's cross-motion for summary judgment is DENIED WITHOUT PREJUDICE as to count II of the complaint.

Judgment dismissing count I of the complaint shall be withheld pending resolution of all issues pertaining to count II.

The parties shall file a joint status report not later than Monday, September 26, 1994 addressing, among other topics deemed relevant, the probable length of a trial on count II of the complaint and the most convenient location for trial. It is anticipated that precise dates for pre-trial conference and trial and for submission of memoranda of contentions and other items described in paragraphs 11 through 15 of Appendix G, RCFC, shall be selected during an unrecorded telephone conference with counsel to be initiated by the court upon receipt of the joint status report.

Further, simultaneously with said joint status report, plaintiff shall file a more definite statement with respect to count II of the complaint setting forth in detail and with particularity (1) the relevant provisions of the alleged implied-in-fact contract upon which plaintiff bases its damages claim, (2) the identity of the government employee(s) whose conduct is asserted to bind the government and (3) the occurrences which form the basis for the allegation that such implied-in-fact contract was breached by the DOJ.